**UNITED STATES of America,
Plaintiff,**

**v.**

**The CONNECTICUT NATIONAL BANK
and the First New Haven National
Bank, Defendants,**

**and**

**William B. Camp, Comptroller of the
Currency, Intervenor.**

**Civ. No. 14583.**

United States District Court,
D. Connecticut.

June 22, 1973.

John W. Clark, Antitrust Div., Dept. of Justice, Washington, D. C., for plaintiff.

Huntley Stone, Pullman, Comley, Bradley & Reeves, Bridgeport, Conn., for defendant Conn. Nat'l Bank.

Richard G. Bell, Tyler, Cooper, Grant, Bowerman & Keefe, New Haven, Conn., for defendant First New Haven Nat'l Bank.

George D. Reycraft, Cadwalader, Wickersham & Taft, New York City, for both defendants.

Charles H. McEnerney, Jr., Office of Comptroller of Currency, Washington, D. C., for intervenor Comptroller of Currency.

MEMORANDUM OF DECISION

ZAMPANO, District Judge.

In this civil antitrust action, the government is challenging the proposed consolidation of The Connecticut National Bank (CNB), the fourth largest commercial banking association in the state, and The First New Haven National Bank (FNH), which ranks eighth among Connecticut's commercial banks. The complaint seeks an injunction, alleg-

ing that the merger will violate Section 7 of the Clayton Act, 15 U.S.C. § 18.[1] The defendants have denied that their agreement to combine would be harmful to competition and have asked this Court to lift the stay on the Comptroller of the Currency's (Comptroller) approval of their plans, which was automatically imposed pursuant to the provisions of the Bank Merger Act of 1966 (BMA), 12 U.S.C. § 1828(c)(7)(A), when this action was initiated.

The Comptroller has intervened and participated throughout the proceedings as provided by 12 U.S.C. § 1828(c)(7) (D). The Court's jurisdiction under Section 15 of the Clayton Act, 15 U.S.C. § 25, is undisputed. After a lengthy trial and post-trial arguments and review of the voluminous briefs and statistical information submitted by counsel,[2] this Court is of the opinion that the defendant banks should be allowed to merge, with the condition that certain divestitures in the so-called "Four Town Area" are accomplished as more fully set forth, infra.

In the pretrial proceedings, the Court appointed a Special Master who was of great assistance to the parties and to the Court in narrowing the issues to be presented. In addition, counsel for the parties demonstrated extraordinary competence, skill and cooperation. Their presentations were of incalculable aid to the Court.

## I. FINDINGS OF FACT

### A. THE DEFENDANTS

Both defendants are banking associations organized under the laws of the United States and both transact business and may be found within the District of Connecticut. CNB maintains its principal place of business in Bridgeport and FNH in New Haven, Connecticut. They are each engaged in interstate commerce.

#### (1) *Connecticut National Bank*

1. CNB was chartered in 1806 as the Bridgeport Bank, with general banking and trust powers and was converted to a national bank charter in 1865. The bank's only acquisition since 1958 involved the Atlantic National Bank in Stamford. (D–35; P–56).[3] The rate of which CNB has expanded by *de novo* branching has abated in recent years. Between 1961 and 1965, CNB opened 15 offices. From 1965 to 1970, the bank added only five branches. (P–73; Tr. 1544).

2. As of December 31, 1972, CNB had total assets of $463.3 million, total deposits of $412.2 million, and total loans of $253.6 million, ranking seventh in deposit size among banks headquartered in Connecticut and fourth among commercial banks headquartered in the state. (P–122; P–70; D–10). Savings deposits constitute approximately 50% of CNB's total deposits. (Tr. 698). CNB has a legal lending limit of $2.8 million.

3. As of December 31, 1972, CNB operated 51 offices in 25 towns. Forty-one of these offices are located in Fairfield County, nine in New Haven County and one in Litchfield County. (D–39).

#### (2) *First New Haven National Bank*

4. FNH is the result of a consolidation in 1957 of the New Haven Bank, chartered under the laws of the State of Connecticut in 1792, and The First National Bank of New Haven, chartered on June 20, 1863, under the National Currency Act. Since its acquisition of Branford Trust Company in 1964, FNH

---

1. See Section II(a), infra.

2. The transcripts of the proceedings in this case, together with the depositions taken prior to trial, consist of over 2500 pages; approximately 25 witnesses testified at trial and more than 240 exhibits were submitted.

3. The designation "D" refers to defendants' exhibits, "P" indicates plaintiff's exhibits, and "Int" relates to intervenor's exhibits.

has not engaged in any merger. (D-35, p. 55).

5. As of December 31, 1972, FNH had total assets of $333.4 million, total deposits of $272.4 million and total loans of $224.7 million, ranking tenth among banks headquartered in Connecticut and eighth among commercial banks in the state. (P-120; P-70; D-10). Savings deposits constitute approximately 50% of FNH's total deposits. (Tr. 1452). FNH has a legal lending limit of $2.3 million.

6. As of December 31, 1972, FNH operated 22 offices, all in New Haven County. (D-38).

### (3) Merger Agreement

7. CNB and FNH have entered into a Consolidation Agreement, dated November 19, 1970, which will result, if carried out, in the consolidation of CNB and FNH under the charter of FNH and with the title, "The First Connecticut National Bank."

8. CNB and FNH prepared and filed an application dated February 2, 1971, for approval of the proposed consolidation and of the Consolidation Agreement with the United States Comptroller of the Currency who supervises all national banks. (D-35).

9. The consolidation was approved by the Comptroller of the Currency on July 26, 1971. (Int-1).

### (4) Divestiture

10. As part of the merger agreement, CNB has contracted to sell its Milford office to the Hartford National Bank (Hartford National), and its Orange office to the organizers of a new bank to be chartered. FNH has agreed to sell its Derby office to the Connecticut Bank and Trust Co. (CBT) upon consummation of the consolidation. (Tr. 838).

11. In addition, the defendants have agreed to divest themselves of three additional offices in Ansonia, Milford and Orange within one year after the proposed merger is approved. (Tr. 687-8).

12. To implement the divestitures, the acquiring banks will obtain by operation of law all of the banking business, including deposits, of the divested branches. The customers will not have to perform any act in order for their deposit business to be transferred to the acquiring banks. (Tr. 2215-6, 2218).

## B. THE BANKING BUSINESS

### (1) General Background and Regulation of Banking

13. Banking is distinguishable from most commercial enterprises in that both state and federal governments insist on the availability of stable banks and banking for the citizenry. If a bank fails, it is detrimental to the entire community. Banking is therefore regulated to insure there is competition; but measures are taken to assure that competition is not unbridled and yet doesn't become over-competitive so that bank failures result.

14. Mr. John L. Donovan, Regional Administrator of National Banks of the First National Bank Region[4] described bank regulators as people who "carry water on both shoulders," in order to assure both competition and solvency in the banking industry. (Tr. 1829-1830). A primary concern in this business is that the competition not become so intense that bank failures result. (Tr. 1831-1832).

15. Congress has required that banks be examined by the Comptroller's Office to insure the health of the banking industry. 12 U.S.C. § 481. The function of the Regional Administrator of National Banks and his examiners is to examine the banks in his jurisdiction at

4. The First National Bank Region covers the states of Maine, New Hampshire, Vermont, Massachusetts, Rhode Island and Connecticut. Mr. Donovan has been Regional Administrator since 1969, supervising 92 commercial bank examiners and nine trust examiners for investigating the 206 national banks in this region.

reasonably frequent intervals to carry out the Congressional mandate. (Tr. 1940–1941).

16. The Regional Administrator is required by the Bank Merger Act to consider the financial, managerial resources, and the future prospects of the existing and proposed banking institutions.[5] (Tr. 1944).

17. FNH has been a member of the National Banking System since its inception in 1863 and is the oldest chartered national bank with Charter No. 1; the Comptroller's Office has been examining it regularly since 1863. CNB has been a national bank since 1865. (Tr. 1928).

18. Federal statutes (see 12 U.S.C. § 481), require that national banks be examined three times in every two years. Generally, they are each examined between eight and twelve months apart. (Tr. 1796). The Comptroller's Office spends between 250 and 280 man-days examining a bank the size of FNH. CNB requires between 420 and 450 man-days. (Tr. 1928–1929).

19. A bank examination involves complete and thorough procedures to determine the bank's assets and liabilities. Between 80 to 85% of the dollar volume of the loan portfolio is reviewed. Examiners express opinions on the general competence of management, the bank's condition, earnings, capital adequacy, liquidity, internal controls, audit procedures, and future prospects for growth. (Tr. 1929–1931).

20. Copies of the examination report are filed with the bank and the Comptroller's Office in Washington along with any corrective action that may be required. Copies also are sent to the Federal Reserve Bank for the appropriate Federal Reserve District and to the FDIC in Washington. (Tr. 1929–1932). In bank mergers, the Comptroller requires a detailed application which is

typified by D–35, the application of the defendants in this case. (Tr. 1935; D–35).

21. The Regional Director makes recommendations on the feasibility of branch expansions and mergers, but the final decisions rest with the Comptroller. With respect to an application for a *de novo* branch or consolidation with another bank, multiple factors are carefully scrutinized including the public need, profitability, economic character of the service area, population and business growth, any anticompetitive effects, management strength, capital adequacy, and legal considerations. In addition, there is verification and a critical evaluation of the application data, and competitor banks are consulted.

22. Pursuant to the BMA, the Department of Justice is notified of the Comptroller's approval of any merger and, after consideration of the application, may move in the courts to block the consolidation, as was done in the instant case.

(2) *Connecticut Banking History and Regulation*

23. The history of banking in Connecticut has been somewhat unique. For example, branch banking was not authorized prior to 1933, at which time the legislature also passed the "Home Office Protection" law that prohibits *de novo* branch banking into a town where the head office of another bank is located. As a result, the biggest cities, including Hartford, New Haven and Bridgeport, are "closed" to *de novo* branching by out-of-town banks.

24. All state banks and loan companies are regulated by the State Banking Commission. During the past 10 years, 32 applications for new bank charters were filed and 22 were approved. However, it seems clear that, unless there is a change of policy, the Commission will

---

5. There are approximately 35 state commercial banks, 68 savings banks, 17 savings and loan associations, one private bank and one industrial bank under the jurisdiction of the Connecticut Banking Commissioner and 26 national banks under the jurisdiction of the Comptroller in Connecticut. (Tr. 1788; 1806–1807).

not approve a new bank charter for the purpose of sale. (Tr. 2153). Moreover, the Commission requires that persons applying for a *de novo* branch represent in their application that they have no intention to sell the new bank or merge it with another bank. (Tr. 1627; D–7, D–84). The Commission has never received an application for a new bank charter for the purpose of sale upon formation to a holding company. (Tr. 2154).

25. According to Dr. Charles Stokes, Chairman of the Economics Department at University of Bridgeport, a specialist in regional economics and advisor to several Connecticut banks as well as the Connecticut Development Commission, by the early 1950's there had emerged in Connecticut five *de facto* banking districts which were essentially distinct, non-overlapping areas: (1) Fairfield County and a part of Litchfield County, (2) Southern New Haven County, (3) Hartford County, excluding the towns of Bristol, Meriden, Middletown and New Britain, but including all other towns east of the Connecticut River, (4) the town of Waterbury, Northern New Haven County and the remainder of Litchfield County, and (5) a midstate region consisting of the towns of Bristol, Meriden, Middletown and New Britain. Banks in these *de facto* districts branched throughout the district in which their headquarters were located and did not compete outside of their districts. (Tr. 886–7; D–38 through D–49).

26. In 1959, the pattern was torn when the Hartford National was permitted to acquire a bank in Stamford, thereby crossing over a boundary which did not exist by law but did prevail in practice. Shortly CBT followed suit and entered into the New Haven and Fairfield markets. Thus, two banks with significant state-wide influence and markets emerged on the Connecticut banking scene. (Tr. 971).

27. In the period since 1960, CBT added 42 offices to its system and en-tered 23 new towns, Hartford National founded 36 offices in 15 new towns, while CNB expanded by 27 in eight towns and FNH grew by 12 offices in five towns. In a theoretical time frame of the next ten to 15 years during which other banks might arguably expand by *de novo* branching, it is highly probable that CBT and Hartford National will be spreading across the state at a rate four or five times faster than any other bank. (Tr. 1478–9; 1538–9).

28. In the one year period September 30, 1971 to September 30, 1972, CBT and Hartford National increased their total assets by $183 million and $196 million respectively, increases almost equivalent to the total assets of the tenth largest commercial bank, Second New Haven Bank. The combined increases in assets in one year for the two Hartford banks are almost equal to the total assets of CNB and exceed the total assets of FNH. (Tr. 1685–7; D–74; D–75; D–76; P–120; P–122). An increase in capital accounts is important from a competitive standpoint, since it increases lending limits and provides the means to acquire new offices and institute new services. (Tr. 932).

29. From 1965 to 1970, CNB and FNH had among the lowest rates of increase in total assets, deposits, and equity capital among the nine largest Connecticut commercial banks, and CNB had the lowest rate of increase in number of branches. (Tr. 939–40; D–16). CNB ranks eighth among the ten largest commercial banks in Connecticut in terms of its ratio of loans to capital and ninth in terms of its ratio of capital to assets. (Tr. 1551–3).

30. The additional deposits acquired by the two Hartford banks, CBT and Hartford National, from December 30, 1969 to September 30, 1972 ($745.3 million) exceeded the combined deposits of defendant banks as of September 30, 1972 ($672.8 million). (Tr. 1526; D–69).

31. The two so-called Hartford banks slowly but surely are penetrating more

and more local markets throughout the state. (Tr. 670). They advertise extensively, actively solicit clients particularly in New Haven and Fairfield Counties, and have succeeded in securing as customers 17 of the 25 corporations with offices in those two counties. (Tr. 1441; D–60). As a result, it seems clear that as they are growing more and more dominant, other banks are finding themselves correspondingly in a weakened position. (Tr. 974). For example, FNH has experienced virtually no growth in demand deposits and a very modest increase in time deposits. (Tr. 1457–8).

32. In addition, the third banking giant, the Union Trust Company ("Union Trust"), was created by merger in 1970.

33. The plaintiff has permitted the state-wide growth by merger of these three banks. (Tr. 473–4).

34. The unsettling state of the banking structure in Connecticut has caused the Comptroller to insist he will not permit new national bank or branch expansion into the major banking markets of this state. (Tr. 1677; 1812; Int–2).

## C. LINE OF COMMERCE

### (1) Comparison of Commercial Banks and Other Financial Institutions

35. Economists approach analysis of markets by first defining a product or service. This is a complicated matter since it is necessary to include in the market products or services that consumers regard as reasonably close substitutes. Economists then determine whether sellers of the defined product or service are close substitutes geographically. (Tr. 1333,879).

36. Even in the opinion of Dr. Murphy who was called by the plaintiff as an expert on banking markets, increased competition among commercial banks and thrift institutions for savings-type liabilities in the 1960's suggests that some reconsideration of the commercial bank product line specification may be in order, especially if mutual savings banks are successful in obtaining the demand deposit privilege in several of the states in which they operate and savings and loan associations make use of the capability to make third-party transfers. (Tr. 209–10; 771; 1026–7; 1231; D–58). Dr. Murphy further testified that commercial banks currently compete with savings banks for at least time and savings deposits, personal loans and real estate loans. (Tr. 150, 221).

37. According to the President of the Connecticut Savings Bank in New Haven (who is a former commercial bank officer) savings banks compete directly with commercial banks for all forms of time and savings accounts, installment loans, mortgage loans as well as for branching sites and personnel. (Tr. 1748–9). All five of the commercial bank presidents who testified cited savings banks as their chief competitors. (Tr. 672, 697; 1451–2; 627–8; 1869–70; 1764).

38. The bank regulatory officials who testified were in agreement that savings banks are strong competitors of commercial banks. (Tr. 2163; 1922–3). The Comptroller requires that an applicant for a de novo branch or for a new national bank charter furnish a list of competing savings banks in the applicant's trade areas along with a map of their locations so that the Comptroller can determine the proximity of substantial competitors to the applicant's proposed branch or new bank. The national bank examiner investigating the applicant's proposal must assess, in his written report, the degree of competition from savings banks and other thrift institutions. (Tr. 1922).

39. In addition, the Connecticut State Banking Commission concurs that savings banks are "formidable competitors" of commercial banks. The presence of savings banks is taken into consideration by the State Banking Department when an application for a new branch of a commercial bank is being evaluated. (Tr. 2163).

40. The plaintiff apparently also recognizes that analysis of the competitive factors involved in a merger of two savings banks must include evidence of the amount of time and savings deposits held by commercial banks. (Tr. 527–8). Since 1961, when the Supreme Court found commercial banking to be the appropriate line of commerce in one case, the plaintiff's expert witness acknowledges that competition between commercial banks and savings and loan associations and mutual savings banks has increased. (Tr. 210–212).

41. In short, competition between savings banks and commercial banks is at a level simply not envisioned ten years ago. A national trend toward more nearly equal powers between commercial banks and thrift institutions, such as savings banks, is discernible from the recommendations of various studies. The Presidential Commission on Financial Structure ("Hunt Commission"), the Friends Study and the report of the New York Federal Reserve Bank recommended broadened powers for all thrift institutions, including checking accounts and third party transfer arrangements, to enable these other financial institutions to survive because commercial banks are increasingly penetrating the retail banking field. (Tr. 741; 245–247). The Hunt Commission has submitted its recommendations to President Nixon and a task force in the Treasury Department is preparing legislation to implement it. (Tr. 575; 749–750).

42. Commercial banks in Connecticut have actively opposed the efforts of savings banks to branch into communities where they will become a competitive threat. (Tr. 1760–1763). In one case, the prospect of further competition from savings banks led a commercial bank to file separate suits against the State Banking Commissioner and the Federal Deposit Insurance Corporation to overturn the approval of a new branch in Simsbury for the Burritt Mutual Savings Bank of New Britain. (Tr. 1763–1974; 732–735; D–77; D–78).

43. Statistics gathered by three federal bank regulatory agencies demonstrate a high degree of comparability between Connecticut savings and commercial banks in the areas of operating income, level of earnings, loans, investment portfolios, income from securities and service charges. (Tr. 1006–1008; D–19–20).

44. The similarity between savings banks and commercial banks is such that one may merge into the other without difficulty. There are several cases in Connecticut and in other states where mutual savings banks were converted or merged into commercial banks. (Tr. 735–737).

45. In the instant action, the plaintiff has admitted that CNB competes directly with savings banks for 79% of its loans. (Tr. 231–232). It is also commonly known that the presence of savings banks has a direct influence on the branching decisions of CNB and FNH. (Tr. 707–8; 1453; 272–3). Both banks must take into account rates charged by savings banks when setting their own rates. (Tr. 697). FNH recently lost its corporate secretary and vice president to its principal savings bank rival, Connecticut Savings Bank, where he now serves as president. (Tr. 1452). Clearly this competition is keenly experienced by all parties.

46. CNB and FNH compete with other financial institutions for loans and deposits as well. Credit unions and personal finance companies are a partial substitute for personal loans. (Tr. 214–215). CNB and FNH compete directly with savings and loan associations for savings deposits and mortgage loans, with insurance companies for term loans, with credit unions for savings deposits and small consumer loans, and with sales finance and personal loan companies for instalment loans. (D–35, pp. 50–53).

(2) *Savings Deposits in Connecticut Commercial Banks*

47. Prior to the late 1950's, commercial banks in Connecticut were not in-

volved in the consumer savings market to any great extent. Since that time, however, commercial banks have accomplished significant penetration into this area of retail banking. (Tr. 725–6; 729; D–61 through D–66). Between 1960 and 1971, savings banks increased their total savings deposits from $2.5 billion to $6.1 billion. Moving at a faster clip, commercial banks increased their savings from $596 million to $2.2 billion during the same time span. The share of the total savings market held by savings banks decreased from 65% to 59% between 1960 and 1971, while the share of commercial banks increased from 15% to 22%. (Tr. 722; D–62; D–63).[6]

48. The number of savings accounts held by Connecticut commercial banks increased by 299,704 between June, 1966 and June, 1970. During the same period, savings accounts held by savings banks increased by 210,249. Whereas commercial banks increased their savings accounts by 31.4%, savings banks experienced an increase of only 11.2%. (Tr. 719–720).

49. Insofar as the personal savings market is concerned, Connecticut commercial banks increased their share from 15.61% in 1961 to 29.09% in 1969, while the share of savings banks decreased from 67.32% to 60.01%. Another type of thrift institution, savings and loan associations, also lost ground to commercial banks. Whereas savings and loan associations had 17.07% of the personal savings market in 1961, they had 15.90% in 1969. (Tr. 723–724; D–65; D–66).

50. The increasing penetration by Connecticut commercial banks into the personal savings market is typical of the trend in all the 16 states where savings banks are located. (Tr. 726–727; D–52). There is no question that there is direct competition between savings

banks and commercial banks for all forms of savings accounts. (Tr. 150; 164; 1747; 1869; 1923).

51. Commercial banks and savings banks pay approximately the same rate of interest on savings certificates of deposit. (Tr. 221–222). The slight difference in the interest rates which may legally be paid on savings accounts by savings banks and commercial banks does not distinguish the two institutions. The difference in rate does not appear to be decisive in the mind of the public. (Tr. 1747–1748; 1661).

### (3) *Demand Deposits in Connecticut Savings Banks*

52. To offset the growing penetration by commercial banks into the personal savings market in Connecticut, savings banks have fought to acquire the right to furnish personal checking accounts to their depositors. Legislation to accomplish this goal was first introduced in 1967 and has made repeated advances in the legislature. In 1971, this legislation was defeated in the state Senate by a very narrow margin. Savings banks have continued to seek these powers and were able to reach a compromise in the recent legislative session, which was signed into law on May 15, 1973. (Tr. 727–729, 742; 1743; 1870).

53. The compromise bill,[7] entitled "An Act Concerning Personal Checking Accounts in Savings Banks and Building or Savings and Loan Associations", allows savings banks to offer personal, non-interest-bearing checking accounts, but prohibits "NOW" accounts (negotiable orders of withdrawal from interest-bearing savings accounts). This legislation had the support of both the Savings Banks Association of Connecticut and the Connecticut Bankers Association. The provisions which apparently paved the way for compromise give the State

---

6. From 1968 to 1969, commercial banks in Connecticut experienced a slight decrease in their share of the personal savings market, while Connecticut savings banks realized a small increase. This brief departure from the prevail-ing trend may be explained by changes in federal monetary policy and the recession in the nation's economy. (D–64).

7. Substitute Senate Bill No. 1646 (File No. 361) as technically amended 4/17/73.

Banking Commission the power to order the savings banks to stop accepting such accounts if that agency determines that a savings bank is seriously jeopardizing the vitality of a neighboring commercial bank.

54. Proposed federal legislation would either preclude interest paid on "NOW" accounts or allow all nationally regulated financial institutions to offer them (both contingent on an extension of the federal power to set interest rate ceilings). The Connecticut bill is scheduled to go into effect at the earliest of three dates: (1) when the national legislation is passed; (2) when the difference in interest rates on all savings and time deposits under one hundred thousand dollars is eliminated by savings banks and by state banks and trust companies which are not members of the federal reserve system; or (3) on December 31, 1975. Sub. Sen. Bill No. 1646, Section 7.

55. Connecticut residents have been exposed to the "NOW" account through their use in the greater Springfield, Massachusetts area, which includes a number of Connecticut towns. The Springfield savings banks have publicized their "NOW" powers in various ways including advertisements in the Springfield newspapers, which are read regularly by northern Connecticut residents. (Tr. 1001).

56. One savings bank in Connecticut, The Savings Bank of Tolland, already offers demand deposits through a power it has historically held in its charter. (Tr. 1005). Once other Connecticut savings banks exercise this right to offer checking accounts or some variation thereof, no problems are anticipated in making this service immediately available to the public, because of the extensive research that has already been conducted, based on the experience of other states. (Tr. 1653, 1658; 1742–1746).

57. Connecticut savings banks are also seeking broader consumer lending powers in order to offer a full range of consumer borrowing services. They are expected to continue their quest for the right to hold pension funds for their own employees, the right to offer credit cards, and the right to make personal loans in excess of $5,000. (Tr. 731–732; 729–730).

58. With the increasingly likely prospect of closer competition between savings and commercial banks, these institutions have amended their bylaws to prohibit interlocking relationships in their governing boards. FNH's Board of Directors voted such a resolution in early 1972 providing that due to "changing relationships between commercial banks and savings institutions, Directors of this Bank who were also trustees of mutual savings banks or savings and loan associations, would not stand for renomination at the end of the year" [8] CNB made a similar reform in January, 1973.[9]

## D. SECTION OF THE COUNTRY

### (1) *The Standard Metropolitan Statistical Areas (SMSA's)*

59. SMSA's are formulated by the Office of Management and Budget by aggregating individual towns on the basis of the commuting patterns of the residents. The criteria used in determining these geographic areas do not include consideration of any banking data. (Tr. 129). The concept was not developed as a tool for analyzing banking markets. (Tr. 387).

60. None of the bankers who testified consider the area within a SMSA to be an area coextensive with any meaningful banking market. The term SMSA meant nothing to the Chief Executive Officer of CNB until he saw it in the Complaint in this case. (Tr. 691). Most bankers in discussing their geo-

---

8. President's Message in the 1972 Annual Report of First New Haven National Bank.

9. Amendment to Section 2.3 Bylaws, voted on 1/18/73.

graphic area talk in terms of service area, not SMSA's. (Tr. 865).

61. Moreover, the report of the Department of Justice to the Comptroller on the competitive aspects of the proposed consolidation did not employ the concept of SMSA in its analysis of the relevant geographic area in which to measure potential competition. (Tr. 533; P-95). In fact, the analysis of the proposed consolidation's effect on potential competition as contained in the Justice Department's report employs the town as the unit of analysis and the State of Connecticut as the relevant geographic market. (P-95, pages 4-5).

62. Even the report of the Federal Deposit Insurance Corporation to the Comptroller of the Currency on the competitive aspects of the proposed consolidation did not employ the concept of SMSA in its analysis of the relevant geographic area in this case. (Tr. 534-536; P-96).

63. A major flaw in the approach often used by the Federal Deposit Insurance Corporation ("FDIC") to compile market share data within a SMSA is the fact that the FDIC reports only deposits resident in bank offices in such SMSA's and does not attempt to determine the total deposits generated from that geographic area. (Tr. 1542). For example, in responding to the FDIC request as of June 30, 1970 to report its "IPC"[10] demand deposits in its offices in the Bridgeport SMSA, CNB reported $87 million, but two months later in preparing a true geographic source analysis of the bank's IPC demand deposits on the basis of origination by town, it was determined that a total of only $77 million originated from towns in the Bridgeport SMSA. This discrepancy resulted in the FDIC figures overstating CNB's position in the Bridgeport SMSA by 13%. (Tr. 1542).

64. All of the larger banks in Connecticut and many out-of-state banks derive business from areas beyond their immediate office areas. (D-60; Tr. 1543).

65. The Bridgeport SMA does not comprise CNB's relevant banking market, since only 57% of CNB's deposits originated from towns in the SMSA, while about 88% of CNB's total deposit business derived from the towns in which CNB has offices. (D-1; Tr. 1539-40). Common sense, then, would indicate that the relevant market areas of CNB and FNH generally coincide with where each has established branch offices.

66. The SMSA concept is particularly useless in New England where banking organizations have offices and derive substantial deposits beyond the boundaries of the SMSA where their head offices are located. (D-1; D-3; D-5; D-6; D-39 through D-49; D-60; Tr. 907).

67. The three federal banking regulatory agencies define a bank's service area as the geographic area from which the bank derives 75% of its deposits. (Tr. 349, 543; 1983). The concept of market area and the concept of service area may or may not be coterminous. One of the criteria for determining whether a bank's service area is a market is whether service area-wide pricing is affected by the behavior of participants in the market. (Tr. 353).

68. Economists would likely determine all of the competing alternatives for banking services available to Connecticut customers, including New York City banks, and take them into account in delineating a relevant geographic banking market in which to analyze the effects of the proposed consolidation. (Tr. 991-2; D-60). Perhaps the most appropriate means by which the Court may measure banking markets geographically would include determining the area in which banking products or services are sold by a group of firms which *act* as though they are competing and evaluating evidence from representative consumers about where they ac-

---

10. "Individuals, partnerships and corporations."

tually conduct their banking business. (Tr. 879–80, 884).

### (2) *The State of Connecticut as a Banking Market* [11]

69. The service and rates provided by one bank are compared by businessmen; if one bank finds it is losing customers to another because of rates or services, the latter bank will consider meeting that competition. (Tr. 362). When a bank prices its mortgage loans, for example, on a system-wide basis, the bank must take into account the pricing practices of all other commercial banks, mutual savings banks and savings and loan associations in the area. (Tr. 377–378).

70. Connecticut banks generally price their services on a system-wide basis (Tr. 903; 624–5). According to their chief executive officers, CNB and FNH both follow a system-wide pricing practice throughout their respective service areas. (Tr. 671; 1437–8).

71. Witnesses called by both sides testified that, when a bank's prices are set on a system-wide basis throughout its service area, its competitive behavior is influenced by every bank operating in its service area. (Tr. 359,378; 671).

72. As the plaintiff readily admits, both Hartford National and CBT, the two largest Connecticut banks, are state-wide banks and operate in the service areas of both CNB and FNH.[12] (Tr. 887–9; D–10; D–41, D–42). Consequently, CNB and FNH each must take CBT's prices and Hartford National's prices into account in determining their own prices, as do all banks competing with these two Hartford banks. (Tr. 381–3; 903).

73. As of August 15, 1972, the Hartford area banks had 333,273 demand deposit accounts which originated in the State of Connecticut. These accounts total $1,078,464,945. They had 301,687 savings accounts which originated in Connecticut, with deposit totals of $661,290,837.

At this same time, the Hartford area banks had 14,917 commercial and industrial loans which originated in Connecticut, with total principal balances of $462,444,000. Mortgage loans originating in Connecticut numbered 15,168, with total principal balances of $290,887,807. (D–60).

74. As of August 15, 1972, a total of 6,382 demand deposit accounts of the Hartford area banks originated in Fairfield County. Total deposits in these accounts were $21,395,000. Savings accounts originating in Fairfield County numbered 12,344, with total deposits of $19,388,000.

In addition, the Hartford area banks had on that date 1,345 commercial and industrial loans which originated in Fairfield County, with principal balances of $20,495,000. Fairfield County mortgage loans numbered 591, with principal balances of $22,771,000. (D–60).

75. As of August 15, 1972, the Hartford area banks had 22,459 demand deposits in New Haven County. Total demand deposits for that area were $52,892,000. New Haven County savings accounts held by the Hartford banks numbered 24,048, with deposit totals of $34,805,000.

The Hartford area banks had 7,555 commercial and industrial loans which originated in New Haven County, with

---

11. The four-town area of Ansonia, Derby, Milford and Orange will be considered separately as it is relevant to Section F, infra, on Actual Competition.

12. The Special Master's Report, indicating the amount of banking business which the Hartford banks, CBT and Hartford National, hold in their New Haven offices actually understates the competitive strength of the two banks in New Haven, since the business they obtain from larger corporate customers and from town treasurers in FNH's branch areas are not reflected in the New Haven area branch books of the two largest Hartford banks. (D–60, p. 11; Tr. 1439–40).

principal balances of $40,357,000. Mortgage loans numbered 1169, with principal balances of $32,595,000. (D–60).

76. As of August 15, 1972, the Hartford banks had 121 demand deposit accounts in the City of Bridgeport, with a total deposits of $813,000. They also held 241 savings accounts, with $341,000 in total deposits in Bridgeport, as of that date.

585 commercial and industrial loans from the Hartford banks originated in Bridgeport with total principal balances of $2,748,000. (D–60).

77. In the City of New Haven, 26,962 demand deposit accounts were held by the Hartford area banks as of August 15, 1972, with total deposits of $49,045,000. 12,559 savings accounts were held by them in New Haven, with total deposits of $16,209,000.

The Hartford area banks also had 3,230 commercial and industrial loans in the City of New Haven, with total principal balances of $21,377,000. Mortgage loans in the City of New Haven numbered 427, with total principal balances of $6,398,000. (D–60).

78. The service area of Union Trust, Connecticut's third largest commercial bank, is equivalent to the service areas of CNB and FNH combined, excluding Bridgeport. (P–70; D–38; D–39; D–49; Tr. 891–2). If Union Trust changed its rates on consumer services, this too would have a competitive impact on CNB and FNH.

79. A comparison of the legal lending limits available to the four largest commercial banks with offices in the Bridgeport and New Haven areas shows that Hartford National and CBT, which have offices in both areas, have legal lending limits about $8 million; Union Trust, which also has offices in both areas, has a legal lending limit of $2.8 million; CNB, which has offices in the Bridgeport area, has a legal lending limit of $2.8 million; and FNH, which has offices in the New Haven area, has a legal lending limit of $2.3 million. (D–70; Tr. 678–679).

80. Obviously, CNB or FNH alone could not effectively compete with the Hartford "giants", or even keep pace with the fast expansion of Union Trust in their own respective areas, much less in other parts of the state-wide market. The hard facts of this struggle for survival are compounded by the very real presence of mammoth New York banking firms who by their incomparable size and capabilities threaten extinction to smaller competitors in the banking region.

In its stipulations to proposed findings, the plaintiff agreed that "State-wide banking in Connecticut should be encouraged."

### (3) New York City As An "Extension" Of The Connecticut Banking Market

81. The opinion of the Comptroller approving this proposed consolidation stated that the resultant bank could compete more effectively with the larger state-wide Connecticut banks and with the out-of-state banks that canvass the area for profitable banking business. (Tr. 2013–2014; Int–1).

82. Dr. Murphy, one of the plaintiff's expert witnesses, agreed that Stamford and Norwalk, Connecticut and New York City, might all be part of the same banking market, based on commuting patterns and the substantial competitive interaction between these areas, and that substantial competition exists for the banking business of Norwalk SMSA residents from banks in Bridgeport, Stamford and New York City. (Tr. 442–4, 448). The exhibits fully support his opinion. (P–2; P–6; P–8; P–9).

83. All in all, approximately 50,000 heads of households commute into Connecticut from New York or vice versa. (Tr. 434; P–2; P–9). New York banks' prices have an inevitable and substantial impact on pricing decisions of Connecticut banks. (Tr. 1875; 902).

84. The daily circulation of New York City morning papers in Fairfield County of the New York Daily News

(44,058) and *The New York Times* (29,360), exceeds the circulation of Fairfield County's only morning daily, *The Bridgeport Post-Telegram* (11,521). Among Sunday papers, 118,405 copies of New York City newspapers circulate in Fairfield County, as compared to 79,000 copies of the Bridgeport paper. (Tr. 901).

85. The giveaway advertisements sponsored by New York City mutual savings banks in the newspapers and on television present competition to commercial banks in Connecticut for savings. (Tr. 633). In Fairfield County, New York banks advertise heavily on television, in the newspapers, and in the railroad stations. (Tr. 1873-4; D-91).

86. The television market concept, "ADI"—area of dominant influence—for New York television advertisers includes Fairfield County. The Bridgeport, Stamford, Norwalk and Danbury area accounts for 4.1% of TV households in the New York television market. (Tr. 900-1).

87. To supplement these public relations efforts, the large New York banks canvass Connecticut, calling on potential customers throughout the state. They have acquired $500 million in Connecticut business through using road men to solicit accounts. (Tr. 1792; 693-694; 631-632; D-60).

88. New York banks competing in FNH's service area are using international services as one means of attracting customers of FNH. (Tr. 1469). According to its president, Union Trust encounters severe competition from New York City banks, particularly in the commercial lending and trust areas. (Tr. 1871). For commercial and industrial loans, New York banks actively solicit customers in Connecticut, including customers of their Connecticut correspondent banks. (Tr. 1872-3).

89. It is not possible for CNB to raise its prices on commercial and industrial loans above the going rate for such loans in national money markets such as New York and Chicago. If the bank were to do so, a large percentage of its customers having approximately $45,000,000 in commercial and industrial lines of credit would be likely to leave the bank, being of such financial stature that they have access to other money markets. (Tr. 1579-80).

90. The data compiled in the Special Master's Report in August and September, 1972 show that six large New York City banks obtained over $483 million in deposits and over $381 million in commercial and industrial and mortgage loans from Connecticut customers, without taking into account time and savings deposits of First National City Bank or the business at certain offices of these banks. Over 23,000 deposit accounts and 1,600 loan accounts of Connecticut customers were held by such banks.[13] (D-60, pp. 16, 23, 24).

91. Of the 23,000 demand deposit and time and savings accounts held by New York banks with statement addresses in Connecticut, about 1,000 are large accounts and the remaining 22,000 are smaller accounts opened by commuters. The accounts generally cover the entire range in terms of size. (Tr. 995-996). A substantial number of checks clearing through CNB are drawn on New York banks. (D-35, p. 44; Tr. 694).

92. Such large department stores in Connecticut as Gimbels and Wallach's in Bridgeport and Bloomingdale's in Stamford clear checks through New York. (Tr. 996). M. Schiavone & Sons, with its main office in North Haven, Connecticut, maintains an office in New York because of its banking requirements in New York. (Tr. 2086).

93. Warnaco, Inc., headquartered in Bridgeport, with $300 million in 1972 sales, and 1,500 employees in Bridgeport, borrows $2 million from CNB out of to-

13. The comparable figures for four large Boston banks were about $37 million in deposits and $63 million in such loans held in 1,791 deposit accounts and 289 loan accounts of Connecticut customers.

tal borrowing of $29 million. The balance of $27 million is obtained from banks in New York, Chicago, and elsewhere. (Tr. 2129–30).

94. In sum, as a factual matter it would be ostrich-like for a Connecticut court not to recognize the closely connected portion of the megalopolis that bridges the Long Island Sound.

E. POTENTIAL COMPETITION

95. The most important questions in measuring the significance of potential competition are: 1) Who are the available entrants in terms of capability, size or geographic proximity; 2) How many potential competitors are eliminated by the merger; 3) What, if any, anticompetitive effects result from the elimination of a potential entrant?

96. Dr. Merton Peck, Chairman of the Economics Department at Yale University and a former member of the President's Council of Economic Advisors, prepared elaborate statistical materials to support his opinions expressed on the issue of potential competition in the instant case. The Court concurs in and adopts the opinions of this highly competent and credible witness.

97. Several of his general observations are pertinent. First, the geographic market in analyzing the competitive effects of a merger might be large when considering influences on rates and very small when considering the threat of entry. (Tr. 1334). Second, the SMSA is not an appropriate area to assess potential competition. A banker in Woodbridge, for example, would not be concerned with a new entrant into Guilford, even though the two towns are in the same SMSA. The reason is simple: the driving time between the two towns is over 45 minutes and there are seven banks with 39 offices in the intervening towns between Woodbridge and Guilford. (Tr. 1239, 1347). Third, ob-

jective factors and subjective criteria must be applied. Fourth, the most significant effects of the instant merger would occur if either CNB or FNH was already operating one or more offices in a town and the other defendant was the most likely entrant, or if the defendants were ranked the number one and two banks "standing in the wings" as potential entrants into a town. In the former situation, the merger would eliminate the highest ranked potential competitor, in the latter case the consolidation would eliminate the second ranked likely entrant. (Tr. 1228, 1244–5). Fifth, legal, regulatory, and economic barriers to entry must weigh in the balance. (Tr. 1248, 1285).

98. More specifically, Dr. Peck made a detailed study of 165 of the 169 towns [14] in Connecticut to determine the merger's impact on potential competition. It is important to note that, in deference to the plaintiff's contention on the "Line of Commerce" issue, he limited his survey solely to commercial banks. He did not take into account the presence of savings banks; thus, it is evident that his conclusions would be strengthened if the competitive effects of savings banks had been considered.

99. The following objective factors were applied in Dr. Peck's study: the size of deposits of each commercial bank, the geographic proximity of the bank, its financial resources,[15] and finally, its incentive to enter.

100. In addition, Dr. Peck considered separately the closed towns, the open towns, the 30 smallest towns, the 15 largest towns, population per banking office and concentration of the markets.

(1) *Analysis By Towns*

(a) *40 Closed Towns*

101. By size, no first-ranked potential entrant is eliminated by the merger;

14. The four town area of Milford-Orange-Ansonia-Derby was eliminated because the plaintiff contends that it involves *actual* competition.

15. Among the first 21 commercial banks, the ranking by assets and deposits is exactly the same. Accordingly, the use of deposit size comprises a proxy for financial resources.

in three towns, the potential entrant excluded by the consolidation ranks second. In 21 towns, the eliminated potential entrants rank seventh out of ten. (Tr. 1315; D–24).

102. By geographic proximity, only one of the 40 towns will lose the closest potential entrant; in no town is the second potential competitor cancelled. In 33 towns, the consolidation does not oust a bank ranking closer than ten other potential entrants. (Tr. 1316; D–25).

103. Dr. Peck did not attempt to combine the ranking of potential entrants by geographic proximity and by size, since he was unaware of any objective way to weigh size as against geographic proximity. He accordingly prepared tables which cross-classify the two criteria of size and geographic proximity to show the combined effect of both criteria. (Tr. 1245; D–23; D–26).

104. The cross-classification analysis indicates that in no case does the consolidation eliminate a potential entrant ranking first in geographic proximity and first in size. The potential entrant affected by the merger ranks fourth in New Haven in geographic proximity and second in size; in Stratford—third in geographic proximity and fourth in size, and in Bridgeport—fifth in geographic proximity and third in size. (Tr. 1316–17; D–26).

105. Thus, the proposed consolidation would not substantially lessen potential competition in any of the closed towns in Connecticut, based both on the ranking by size and by geographic proximity of the potential entrant. (Tr. 1321).

#### (b) *125 Open Towns*

106. D–21 examines the effect of the consolidation in 125 open towns in Connecticut ranked by size of the potential entrant bank. It reveals that in none of the 125 towns is the potential entrant ranked first in size eliminated by the proposed consolidation. In two towns the second ranked potential entrant is excluded by the merger. The majority of the towns, namely 63, fall into the

category where there is elimination of the seventh ranked potential entrant. (D–21, Tr. 1308).

107. By geographic proximity, in only one town is the leading potential entrant eliminated by the consolidation and in no town is the second ranked potential entrant eliminated. In most cases (112 out of 125) the proposed consolidation does not affect the potential entrant ranked among the top ten banks. (Tr. 1309; D–22).

108. D–23 cross-classifies the effect of the proposed consolidation on size and geographic proximity in the 125 Connecticut towns and illustrates that in no town is the largest and nearest potential entrant eliminated. (Tr. 1309–1310; D–23).

109. With respect to potential entrants identified by the plaintiff as having state-wide capability, the analysis demonstrates that in no town is there less than four potential entrants remaining after the proposed consolidation. Actually, in 52 towns, nine such potential entrants would remain after consolidation. (D–34; Tr. 1311).

110. Therefore, the proposed merger would not have the effect of significantly reducing potential competition in the 125 towns open to *de novo* branching. (Tr. 1311–2; D–21; D–22; D–31; D–32; D–34).

#### (c) *30 Small Towns*

111. Prof. Peck also conducted a survey of the 30 small towns in Connecticut which have populations projected for 1980 by the Connecticut Office of State Planning of 5,000 or less and in which there is presently no banking office. (Tr. 1300; D–32).

112. With respect to each of these towns there are presently ten banks available as potential entrants identified by the plaintiff as capable of state-wide operation, while after the proposed consolidation there would remain nine. Since it is not likely that there would be more than one bank in each of these towns in 1980, and there would remain

nine potential entrants available among the larger banks in the state, the proposed consolidation would not have any tendency to substantially lessen potential competition in any of such towns. (D-32, Tr. 1301).

113. Moreover, the divestiture would still leave no fewer than six potential entrants in the towns surrounding the four-town area. (Tr. 1307; D-27).

### (d) *15 Large Towns*

114. Of the 15 towns in Connecticut with over 50,000 in population,[16] there is no town where fewer than four of the banks identified by the plaintiff as capable of expanding into state-wide systems would remain as potential entrants after the proposed consolidation. The most typical case is that in six of such towns six such banks would remain after the consolidation. (Tr. 1281; D-30). A sampling of the major towns is illustrative.

### HARTFORD

115. With respect to Hartford, the proposed merger would have the effect of eliminating FNH as a potential entrant ranking fifth in size among the ten largest potential commercial bank entrants.[17] Among potential entrants ranked by geographic proximity the proposed consolidation would not affect any of the ten closest commercial bank potential entrants. (Tr. 1252; D-27 [Hartford Data Sheet]).

116. After the proposed merger is accomplished, six of the potential entrants selected by the plaintiff as capable of developing into state-wide banking operations would still remain as potential entrants into Hartford. Hartford, being the center of the insurance industry and the state capitol, makes it an attractive market for banks to enter. However, it is a closed town which makes entry more difficult. (Tr. 1255).

117. Assuming regulatory approval, it would be possible for one of the potential entrants to enter Hartford via merger with one of three small banks headquartered in Hartford. The fact that there are only three banks available for acquisition in Hartford would increase the premium that a selling bank could extract from a purchasing organization and tend to discourage merger. (Tr. 1257).

118. Generally, the size of a bank within a market area can raise barriers to entry as to outside potential competitors if there is a significant size difference. (Tr. 1365). Hartford, being the head office town of Connecticut's two largest banks, with the market heavily concentrated between them, does not present an encouraging prospective site to potential entrants. (Tr. 1363).

### BRIDGEPORT

119. In analyzing Brigeport, FNH is by size the third most likely entrant, behind Hartford National and Union Trust. Before the merger there are six banks ranked by size which are among the ten identified by plaintiff as being capable of state-wide banking; after the merger, there are five remaining likely potential entrants. Ranked by geographic proximity, FNH is fifth so that there are four other banks operating branches nearer to Bridgeport than FNH. (Tr. 1259-60).

120. The fact that Bridgeport is closed to *de novo* branching means that the easiest mode of entry historically is not available to potential entrants. The other mode of entry into Bridgeport would be the possibility of merger with one of the two banks operating in Bridgeport not among Connecticut's ten largest commercial banks, Lafayette Bank and Trust Company and James

---

16. The 15 towns in Connecticut with 1970 population over 50,000 in order of size are: Hartford, Bridgeport, New Haven, Stamford, Waterbury, New Britain, Norwalk, West Hartford, Greenwich, East Hartford, Fairfield, Meriden, Bristol, West Haven and Danbury. (D-31).

17. Union Trust is the largest potential entrant.

Staples Company. (Tr. 1260–1). The same problems mentioned with respect to the acquisition of the small banks in Hartford exist to a heightened degree in Bridgeport.

121. The fact that Bridgeport is a relatively slow growth area in terms of various economic indicators,[18] compared to the State of Connecticut, is an additional factor which affects the likelihood of entry by commercial banks into Bridgeport. (Tr. 1262; D–28).

122. In order to serve certain kinds of the medium-sized commercial businesses centered in downtown Bridgeport effectively, entry by a commercial bank into Bridgeport itself would be necessary. (Tr. 1264–5). In Bridgeport the fact that four of the state's ten largest commercial banks are operating there already as existing competitors might discourage some potential entrants from entering.

### NEW HAVEN

123. New Haven is the third largest town in Connecticut and the proposed consolidation would have the effect of eliminating CNB, the second largest potential entrant ranked by size. Before the merger there are five potential entrants into New Haven as ranked by the plaintiff capable of becoming state-wide banks and four into New Haven after the consolidation. CNB is ranked fourth among the potential entrants into New Haven based on geographic proximity which may be a less important factor in larger towns. (Tr. 1268–1269).

124. According to D–29, New Haven, compared with the State of Connecticut, has grown more slowly. Retail and wholesale sales are lagging, total employment is down. It appears that New Haven is a less attractive market for entry than Bridgeport. (Tr. 1276; D–29). Since New Haven is a closed town and the state's five largest banks are already in New Haven, entry, apart from merger, must be by the highly unlikely one of a new charter. (Tr. 1278; 1449–51).

125. With respect to entry into New Haven by merger, the only bank smaller than FNH would be Second New Haven Bank, one of the ten largest banks in the state. This fact would raise the cost of acquiring it considerably. (Tr. 1271).

126. Five of Connecticut's largest commercial banks are already in New Haven and have more impact on competition than if such banks were potential competitors. (Tr. 1279). Thus, the reduction from five to four in the number of potential entrants would clearly not be of major significance in evaluating the competitive structure of banking institutions in New Haven.

### STAMFORD

127. According to population projections prepared by the Connecticut State Planning Office for 1980, six banks could establish one office each in Stamford without reducing the population per banking branch below present levels. (Tr. 1297; D–31). Currently, in Stamford, only the First Stamford Bank & Trust has just one office. All the out-of-town banks have at least four offices.

128. Without reducing the population per banking office in Stamford, one or possibly two banks could enter Stamford with a system of branches up to 1980. After the consolidation, there would be five banks in Stamford identified by the plaintiff as being capable of state-wide operations remaining as potential entrants. (Tr. 1297–1298; D–31).

---

18. Total retail sales made in Bridgeport increased only 8.5% during the period 1958 to 1967, in contrast to the increase state-wide in retail sales for the same period which was 62.5%. Employment of Bridgeport residents increased in Bridgeport by only 3.4% from 1960 to 1970, as compared to the increase in employment of state residents by 25%.

Manufacturing employment in Bridgeport increased 6% from 1963 to 1967, in contrast to the increase in such employment in Connecticut of 14.1%. The population of Connecticut grew 19% in the ten years from 1960 to 1970, as compared to population trends in Bridgeport during the same period which were essentially stable. (D–28; Tr. 1262–4).

129. The population per bank office in Stamford is lower than the other 14 cities on D–31 except Danbury. This indicates that some of the entries into Stamford may have occurred in anticipation of growth and therefore prospects of entry into Stamford are not as good as they might otherwise be. (D–31). The significance of the present low population per banking office figure in Stamford and elsewhere in Connecticut is that the area is saturated or approaching saturation thereby discouraging new entrants. (Tr. 1298–1299).

## DANBURY

130. Danbury, although currently the smallest of these 15 towns, presents a situation similar to Stamford. (D–31). Only five bank offices could be opened in Danbury by 1980 without reducing the present population per bank office. (Tr. 1299).

131. After the proposed consolidation, four banks would remain as potential entrants into Danbury which are capable of developing into state-wide banking systems. If all four of the potential entrants entered Danbury following the proposed consolidation, the nine largest commercial banks in the state would all be operating in Danbury.

### (e) *Population Per Banking Office*

132. Population per banking office is a useful measure in assessing a community's need for additional banking services in that it reflects factors of local growth and personal income. This concept is also significant because it is taken into account by bank regulatory agencies in determining whether to approve *de novo* branch applications. (Tr. 342; 1288; 653–654). An indication of the amount of demand in open towns in Connecticut would be represented by the present population per banking office in these areas, which was 5,633 in 1972. (Tr. 1300).

133. In a *de novo* branch application the examiner reports both past and estimated census figures for the head office city, the community in which the branch would be located and the service area of the proposed branch. (P–128). The summary of information accompanying the *de novo* branch application furnishes the population of the service area. (Tr. 1984).

134. The Comptroller's regional administrator for New England testified that it is his practice, in making recommendations on *de novo* branch applications, to consider the population per banking office figure, and if it was below the state's average for comparable towns, then other factors would have to outweigh it before he would favorably recommend its approval. (Tr. 1986). One such factor which might influence the Comptroller's decision is the availability of enough banking business to support a new branch in the area.

135. Available banking business must exist in an area in order for the branch to be successful, and the Comptroller requires the applicant bank to demonstrate that it has a good chance of obtaining some of it. (Tr. 1821). The deposit structure and available banking business in an area are measured by sales figures and other criteria besides population. (Tr. 1797).

136. There are 136 towns in Connecticut where neither FNH nor CNB have banking offices, 103 of which are open towns and 33 closed. Of the 103 open towns, approximately 40 have no bank because they are extremely small in population, mostly in the 1,000 to 2,000 range. A branch or bank in towns with such populations would not be very profitable. (Tr. 1823–1824). Most of the non-bank towns are in rural areas where large sections are in state or national forests in Windham, New London and Litchfeld counties. (Tr. 1824).

137. In a town of 12,000 people with no bank which might justify one bank, it would take a protracted period of time for it to become profitable. The Regional Administrator, based on the factor of population per banking office only, testified that he would be reluctant

to recommend that two banks be authorized to enter. (Tr. 1986–1987).

138. CNB has offices in 17 towns in Fairfield County, six of which are closed. In the remaining 11 towns, the addition of one office by FNH would reduce the population per banking office figure below the state's level and would make it more difficult for the new entrant to become profitable and viable within a reasonable time period.

139. In the six remaining towns in Fairfield County where neither CNB nor FNH have a branch, Greenwich is closed, Easton has a population of 4,900 and Sherman has a population of 1,500. Neither has a bank in town. Easton could use one office but it would not likely become quickly profitable. (Tr. 1910). The fact that no bank has chosen to enter these towns is also given some weight by the Comptroller and his agents. (Tr. 1910).

140. CNB is in seven towns in New Haven County. In a survey of these towns, the Regional Administrator did not consider the likelihood of FNH branching into the closed towns of Waterbury and Orange nor into Ansonia where a branch of the proposed consolidated bank is scheduled to be sold. The remaining towns are already adequately banked and the introduction of FNH into any of these towns would reduce the population per banking office below the 5,633 figure of open towns in Connecticut with one or more banks.

141. FNH has offices in ten towns in New Haven County. It is unlikely that CNB will branch into the three closed towns of Hamden, New Haven and Orange or into the town of Derby which is scheduled to be divested. In the towns of Branford, Guilford and Wallingford, according to the Regional Administrator, another entrant would have a difficult time becoming successful. In the remaining towns branch applications have been denied. (Tr. 1826–1827).

142. There are 12 towns in New Haven County where neither CNB nor FNH is located. In evaluating potential competition, the Comptroller did not consider the likelihood of branching into five of these towns which are closed. Further, Beacon Falls and Bethany with populations under 4,000 could probably support one bank, but they could not support the two competing defendant banks. In the balance of these towns, while some could support one new entrant, to support two (FNH and CNB) would reduce the population per banking office figure substantially below the state average. (Tr. 1827–1828; 1907–1908).

143. Connecticut's State Planning Office projects a modest decrease in population for Bridgeport in the period from 1970 to 1980, with the effect that no banks could enter Bridgeport without reducing the population per bank office, although five potential entrants would remain after the proposed consolidation. (Tr. 1287; D–31).

144. The population growth projected for New Haven in the decade 1970 to 1980 would permit two new single office entrants without reducing the 1970 population per banking office. Nevertheless, four potential entrants would remain if the consolidation takes place. (Tr. 1287; D–31).[19]

### (2) Concentration

145. Concentration is an index of the proportion of the output of goods or services of all firms in a market held by the largest firms in such market. (Tr. 143). In a concentrated market, high profits are a proxy for an absence of competition. If a market is concentrated, that fact should be reflected in higher than average prices and higher profits over an extended period of time. (Tr. 296, 372; 1425).

---

19. It should be noted that no existing bank in New Haven operates only one office; the fewest number of offices (two) are operated by Union Trust. (Tr. 1287–8; D–27) [New Haven Data Sheet].

146. Although not all economists agree that concentration ratios have any validity or utility, if the geographic market and product market have been adequately defined, concentration ratios indicate a firm's market power. (Tr. 904–905). In banking markets generally, concentration ratios are high, because it is a regulated industry. (Tr. 368; 1418; 2008–9). A market extension merger, such as the present proposal, in and of itself, does not increase concentration. (Tr. 297).

147. The number of commercial banks in Connecticut has decreased from 1955 to 1971. Yet it is not only possible according to Dr. Murphy, but it is "reasonably probable" that this reduction has resulted in a more competitive banking structure in Connecticut. Mergers have been one of the reasons for this increased competition. (Tr. 405–407; P–90).

148. D–4 indicates that since December 31, 1955, through 1971, in the 169 towns in Connecticut, the number of banking alternatives (including savings banks) has increased in 107 towns, decreased in two towns and remained the same in 60 towns and, even according to the plaintiff's witness, this is procompetitive. (Tr. 401–403; D–4). In 20 of the 23 towns in Fairfield County, there are more of these banking alternatives available today than in 1955. No town in Fairfield County has less banking alternatives today than in 1955. Also, in 23 of the 27 towns in New Haven County, there are more savings and commercial banks combined available today than in 1955. (Tr. 1524–5; 989–90; D–4).

149. Concentration ratios among Connecticut banks must be evaluated in light of the minimum of $500 million kept on deposit by Connecticut residents and businesses in New York and Boston banks. This amount, which is equivalent to a bank ranking just below the largest three Connecticut banks in terms of size, reduces appreciably the concentration ratios mentioned by the plaintiff in this case.[20] (Tr. 996–997; D–60).

150. Concentration ratios based on deposits held by Connecticut banks are overstated by at least 10% when deposits of Connecticut residents held in New York banks are included. (Tr. 997–8; D–60).

151. Since 1961, Hartford National has completed four mergers, CBT has had five and Union Trust, one. It must be assumed that the Justice Department reviewed these mergers by the State's three largest commercial banks and decided not to file suit. Collectively, they have had an impact on the concentration of banking resources in Connecticut of an approximate 5.4% increase. (Tr. 472–76; P–672; P–90). No other bank experienced as many mergers as Hartford National or CBT did in the period from 1955 to 1972. (Tr. 528–29; P–72).

152. Although these three largest banks are the most likely potential entrants into other areas of the state, even according to the plaintiff's expert witness, their mergers were allowed to proceed, without the imposition of the requirement that they expand into other markets via *de novo* branching. (Tr. 476–478; P–70).

153. The share of all deposits in Connecticut banking organizations held by CBT and Hartford National increased from 17% in 1959 to 19.6% in 1970, or 2.6% while the next four largest Connecticut banks increased their combined share by only 0.2% (Tr. 917; D–9). The combined share of all deposits in Connecticut commercial banks held by CBT and Hartford National has steadily increased from 34.5% in 1969 to 39.2% in 1970, while the share of such

20. In the standard economic treatises concerning competitive effects of concentration by Bain and Mann, none of the industries discussed are subject to the same type of external competitive pressures as banks in Connecticut receive from firms with as large a size disparity as exists between New York and Connecticut banks. (Tr. 1422–4).

deposits held by the next six largest banks combined during the same period increased in some years and decreased in other years with a net increase of only 1.2% from 35.8% to 37.0%. (D–13).

154. To the extent there has been any increase in concentration of deposits among Connecticut banks or among Connecticut commercial banks since 1959, virtually all of the increase is accounted for by two savings banks and the two Hartford banks. (D–8; D–9; D–10; D–13).

■ 155. The fact that in New Haven, CBT, Hartford National and Union Trust are all substantially larger than FNH is relevant in determining whether concentration ratios or market shares are an indicator of an absence of competition. The resources that the three larger commercial banks in New Haven can call upon are far greater than the resources of the two smaller commercial banks headquartered in New Haven, FNH and Second New Haven Bank. (Tr. 1422–3; P–70).

156. Also, in assessing the size and competitive strength of banks in Bridgeport, it is relevant to take into account that State National Bank is a subsidiary of S&H Green Stamps, based on the "deep pocket" theory that the parent corporation's substantial assets will have an impact on the competition in which the subsidiary is engaged. (Tr. 1424). If the financial strength of State National Bank's parent corporation, S&H Green Stamps, is taken into account, CNB would not appear among the top four Connecticut commercial banks competing in the Bridgeport area. (Tr. 1534–5).

157. Savings banks should also be taken into account in assessing the relative market power of banks competing in the New Haven and Bridgeport area. (Tr. 909–10). Plaintiff's exhibits entitled "Commercial Banks Operating In Bridgeport SMSA", P–65, and "Commercial Banks Operating In New Haven SMSA", P–68, do not reflect all the deposits derived from these SMSA's or the relative competitive strength of the banks listed, or savings banks as competitive alternatives. (Tr. 455, 456–7; 905–6, 909–11; P–64; P–68; D–60).

158. Even if an SMSA were assumed to be a relevant market, the concentration ratio of the five largest commercial banks in the Bridgeport SMSA declined from 99.1% in 1966 to 98.7% in 1970, while in New Haven the five-firm concentration ratio declined from 93.5% to 91.1% in the same period. (Tr. 944; D–18). The concentration ratios in the area comprised of the combined Bridgeport and New Haven SMSA's would have shown a decline from 91.7% in 1966 to 88.2% in 1970 if the consolidation were assumed to have taken place before 1966, and after giving effect to divestiture, from 89.2% to 85.1% during the same period. (Tr. 944, 968; D–18).

159. Whether one considers the concentration of deposits held by the largest five commercial banks or by the largest two commercial banks or by the largest commercial bank, the trend of concentration is downward in the Bridgeport SMSA, in the New Haven SMSA, and in the combined SMSA. Thus, regardless which market one selects as the relevant geographic market in which to measure concentration ratios, the percentage of deposits held by the largest banks is decreasing. (Tr. 954–955; D–18).

160. As of December 31, 1971, CNB held less than 6.6% of the Connecticut deposits of commercial banks competing in Connecticut while FNH held less than 4.7%, or less than 11.3% combined of all Connecticut based commercial bank deposits. The consolidation would produce an increase of less than 1.8% in the combined shares held by the ten largest commercial banks in Connecticut, and an increase less than 0.9% in the combined shares held by the five largest banks headquartered in Connecticut, including savings banks. (Tr. 1014; P–70; D–60; D–10).

161. Between December 31, 1969 and September 30, 1972, Hartford National

and CBT increased their deposits in an amount greater than the entire deposit structure of the proposed consolidated bank. During this timespan, the deposits of the two Hartford banks increased by a total of approximately $745 million. In contrast, FNH and CNB had total deposits on a consolidated basis of $672.-8 million on September 30, 1972. (Tr. 1526–1527; D–69).

162. In this short period, Hartford National increased its deposits by 40.-8%. During the same timespan, CBT increased its deposits by 47.8%. In sharp contrast, FNH and CNB together increased their deposits by 21.7%.

163. A comparison of the total resources of the four largest commercial banks with offices in the Bridgeport and New Haven area shows that the two Hartford banks have in excess of $1.2 billion; Union Trust has about $600 million; FNH has about $300 million; and CNB has about $400 million. (Tr. 1527–1528; D–70).

164. The only true measure of earnings which is a common denominator for all banks that has been brought to the Court's attention is the percentage return on assets. (Tr. 1623–4). An industry with returns of less than 1% on invested assets is obviously an industry with low profit margins, suggesting that prices and return on assets are being kept down through competition. (Tr. 1575).

165. In the banking industry a 1% return on assets is an attractive operating performance that is commonly set as a target for banks but rarely achieved. According to CNB's Vice President when a 1% return on assets is achieved most bankers would consider that they are doing well. (Tr. 1599). Yet CNB has never achieved its target of a 1% return on assets. (Tr. 1546).

166. If a bank wished to raise prices, putting aside its competitive ability to do so, the categories of services in which prices would be raised include demand deposit service charges, loan rates, safe deposit box charges, trust services and generally any financial service the bank provides. (Tr. 1575–6). CNB has found itself unable to raise these prices to get a higher return on its assets, which failure its officers attributed to stiff competition. (Tr. 1574–5).

### (3) Capability and Incentive of Defendant Banks to Expand

#### (a) De Novo Branching

167. CNB opened 15 de novo branch offices in the period from 1961 to 1965, while in the second half of the 1960's the bank opened only five offices. The profitability of the bank in terms of return on investment increased by about 30% when the bank's de novo branching activity was thus scaled down. (Tr. 1544). From 1965 to 1970, CNB had the lowest rate of increase in number of branches among the nine largest commercial banks headquartered in Connecticut. (Tr. 939; D–16).

168. CNB's branching slowdown occurred partly due to the management's opinion that expansion via de novo branching was becoming prohibitively expensive with favorable sites more difficult to find. Also the profitability of all CNB's offices opened since 1960 was found to be less (26% less in 1971) than the overall profitability of the bank.[21] (Tr. 701; 1544).

169. An additional financial consideration militating against maintaining the pace of de novo branch offices opened by CNB in the early 1960's is the actual cost to shareholders in terms of both their short run and long run interests. (Tr. 1545–6).

---

21. The accepted method of computing branch earnings or losses is to compute these income or expense items over which the branch manager has direct control and then to allocate expenses incurred by the home office in support of the activities of the branch office. (Tr. 1594–5). As a general rule, a branch must be in operation for six to seven years before it ceases to be a "drag" on the overall performance of the bank. (Tr. 1547; 1598–1599).

170. CNB's average initial investment in the *de novo* offices opened during the 12 year period prior to trial was in excess of $250,000 per branch, and higher toward the end of the period than at the beginning due to rising construction costs. (Tr. 1544). In 1962 a *de novo* branch of CNB cost between $150,000 to $275,000 each, whereas today it would cost $300,000 to establish a comparable branch. (Tr. 704).

171. In order for a new branch office costing about $250,000 to reach CNB's target of a 1% return on invested assets, the office would have to reach about $4 million to $5 million in deposit business. (Tr. 1546). Whether a particular branch office is technically in the black or in the red does not matter significantly if, in fact, the branch constitutes a drag on the performance of the bank. According to its Vice President, CNB has offices that have never in their history reached the point where they were beginning to carry their own weight. (Tr. 1599).

172. Both federal law and the Comptroller's implementing regulations severely inhibit, if not prevent, CNB from seriously considering substantial expansion in the future by *de novo* branching. Federal banking law, 12 U.S.C. § 371d, limits the investment of a national bank in "bank premises" (the bank's head office and its branches) to the equivalent of 100% of the bank's capital stock. CNB has utilized this entire amount and, pursuant to the Comptroller's regulations at 12 CFR 7.3100(e), must apply to the Regional Administrator for permission to make future investments in fixed assets.

173. CNB has been granted one variance by the Regional Administrator in order to make major improvements and additions to its Bridgeport head office. For each branch to be erected in the future, application must be made not only for permission to establish the branch itself but also for permission to exceed further the investment limitations of 12 U.S.C. § 371d. "Reasonable need" for each variance must be established. (Tr. 1545; 1547–1550).

174. Guidelines of the Comptroller regarding capital are that when a bank's entire loan portfolio is eight times its capital, the capital structure is considered weak. Presently the CNB ratio is 8.1. (Tr. 692–693). A bank's ratio of loans to capital has a significant effect on its ability to raise additional capital through the issuance of new stock ("equity financing") and will affect adversely the interest rate CNB would have to pay on the issuance of debentures ("debt financing"). (Tr. 693).

175. The investment of a national bank in land, building and banking premises may not exceed its capital stock account, which in the case of CNB is $7,151,000, without permission of the Comptroller. Upon completion of the remodeling of CNB's head office facilities, the bank will have an investment in banking premises of approximately $9 million, or about $2 million in excess of its legal limit. (Tr. 1548). The Comptroller's policy is that he will normally approve an application to exceed his regulations concerning investment in banking premises where the investment will not increase banking premises to an amount above 50% of total capital accounts. (Tr. 1591).

176. While a bank may circumvent 12 U.S.C. § 371d and 12 CFR 7.3100(e) by leasing space for new branch facilities instead of purchasing and owning outright, leasing presents practical problems. A lease, unless capitalized, does not show up on a bank's statement of condition as an investment in banking premises, but if CNB were forced to lease every new banking facility, it would severely limit the bank's flexibility in selecting sites. (Tr. 1549–50). Less than one-half of CNB's branch offices are leased. (Tr. 1618).

177. The ratio of profits to capital (i.e., the "return on capital") is a commonly accepted means of analyzing profitability. Under this measure, CNB compares quite favorably to the other

nine largest banks in Connecticut. However, the concept of return on capital is both defective and superficial when it is used to make comparisons among banks, inasmuch as the capital strengths of banks differ significantly. In other words, since CNB is not, in relation to its total assets, well capitalized vis-a-vis other banks and the Comptroller's guidelines, its return on capital must be higher. (Tr. 1623).

178. CNB compares very unfavorably to the other nine largest commercial banks in the state in terms of its ratio of capital to assets. CNB now has six and one-half dollars of capital for every hundred dollars of assets. Of the top ten banking organizations in Connecticut, eight have a higher ratio, indicating a stronger capital position, and only one has a lower ratio. (Tr. 1551).

179. From 1950 through 1971 the capital structure of Hartford National and CBT (capital, surplus and undistributed profits) compared with that of CNB and FNH shows the gap between the two Hartford banks has widened. Hartford National in a ten-year period has added $37 million in capital structure and that addition alone is more than CNB's total capital structure in 1970. (Tr. 928; D–14; D–15). From 1950 to 1970 Hartford National increased its capital through merger, selling stock and by adding undistributed profits, from $14.2 million to $76.9 million. (Tr. 919; D–14; D–15).

180. In terms of the ratio of the market price of its stock to the per share earnings of the stock (the "price-earnings ratio"), CNB compares very unfavorably with the other nine largest commercial banks in the state. There is only one commercial bank which has a lower ratio of market price to per share earnings. The price earnings ratio of CNB, i.e., the "multiple" at which the bank's stock is sold, is approximately seven, and the price earnings ratio of

the two large Hartford banks is ten or more. (Tr. 681; 1552; 1624–1626).

181. Without the proposed consolidation, it is unlikely that CNB would be able to enter the Hartford area, because it lacks the capital vitality to manage such a move through an exchange of stock. A merger of FNH and CNB would increase the resultant bank's stock multiple and thus improve the market price of the stock, improve bank earnings and assist in the banks' ability to acquire other banks because fewer shares would be needed to acquire a new office. (Tr. 676–677; 681–684).

182. To the extent management of FNH is giving any consideration to *de novo* branching, according to its president, the areas in which it has been concentrating its research are to the east and north of its present market area. (Tr. 1433). On the average during the past ten years, FNH has opened one and one-half new branches per year [22] and would expect to branch in the next ten years at approximately the same rate depending on the availability of locations, funds and talent to be invested in such branching. (Tr. 1432; 1466).

183. An example of the rise in cost of opening *de novo* branches in the New Haven area is FNH's Allingtown branch opened approximately ten years ago for $60,000. Since the bank had outgrown the branch by 1971, it was replaced by a branch in the next block with a building not much larger but with more parking space for a price of about $300,000. There has also been a substantial increase in the cost of staff to operate a branch. (Tr. 1464–5).

184. In 1971, of FNH's 22 offices, nine were still showing operating losses aggregating $535,000 per year. (Tr. 1688). For example, FNH has established two inner-city offices in New Haven in the Dixwell Plaza and Howard Avenue areas to serve minority group communities without expectation that

22. Of the nine *de novo* branches opened by FNH since 1963, five are located in the City of New Haven.

such branches would be profitable. (Tr. 168–90).

### (b) Toehold Acquisition

185. It is conceivable as an alternative to *de novo* branching that a bank could enter a market by foothold or toehold acquisition, that is, by acquiring one of the smallest banks in the market. As was mentioned previously in connection with *de novo* branching, a bank with a price-earnings ratio of seven (like FNH) pays a higher effective price in acquiring another bank by exchange of shares than a bank with a price-earnings ratio of ten, such as CBT and Hartford National. Stockholders of the bank with the lower ratio, therefore, suffer greater dilution in such a transaction. (Tr. 1564).

186. The plaintiff's expert witness testified that there are four toehold acquisitions available to CNB in the New Haven SMSA which would make CNB an effective competitor in New Haven. They are: North Haven National Bank, Hamden National Bank, Woodbridge Community Banking Company, and Community Banking Company of North Branford. (Tr. 311–316; P–68).

187. Acquisition by CNB of the Woodbridge Bank and Trust Company, assuming it could be done, would not constitute an effective entry into New Haven. (Tr. 1461; 913). The premium that would have to be paid for the Woodbridge Bank and Trust Company is not justified either by the bank's deposit growth or by the potential growth in the area the bank serves which is restricted by the Wilbur Cross Parkway as a geographic barrier, by West Rock, by the valley going through the area, and by the fact that the town of Woodbridge has a very small business section. (Tr. 1461–2).

188. Furthermore, acquisition of the Woodbridge Bank and Trust Company would not provide a means to branch into the closed towns of New Haven, North Haven, Hamden, Seymour or others in the greater New Haven area.[23] (Tr. 690–1; D–36). Acquisition of a toehold bank in North Branford would not provide the means for an effective entry into New Haven for like reasons. (Tr. 690–691).

189. Also, acquisition of the small banks in Hamden or North Haven would not facilitate entry into New Haven because they would have to maintain at least one or two offices in the central business district. There are a large number of corporate headquarters located there, as well as many law firms from which trust business is obtained. The downtown area cannot be served by acquisition of a single office bank in any of these distant towns. (Tr. 1690–1692; 913–915).

190. It is unlikely that FNH will expand substantially in the foreseeable future by *de novo* branching or toehold acquisition inasmuch as nine of FNH's 22 branches are losing money. The aggregate loss from the nine offices amounted to $525,000 in the last fiscal year. (Tr. 1688).

191. According to its president, CNB has discussed merger with smaller banks in its own area and elsewhere frequently and has failed to come to terms either on price or because of refusal to sell. (Tr. 784).

192. One of the benefits of the proposed consolidation for shareholders of both defendant banks is that there is no dilution on either side because it is a true consolidation in terms of book value. (Tr. 1566).

193. In sum, the plaintiff has simply not established that any "toehold" acquisition-sized banks in the service area of either defendant are presently subject to being acquired or likely to be so in the foreseeable future.

---

23. In toehold acquisitions if the merging bank had a branch in a closed town the resultant bank could retain it but could not further branch in the closed town. (Tr. 339).

### (c) *Holding Company*

194. Another alternative method of entering a closed town in Connecticut claimed by the plaintiff is through a holding company establishing a *de novo* charter in the town. This is one means of overcoming restrictive branching laws in a state. (Tr. 190–192). However, this approach has not yet been used in Connecticut, either because it is considered too expensive or too risky.[24]

195. The Federal Bank Holding Company Act, 12 U.S.C. § 1841, et seq., was passed in 1956. Therefore, at least since that time it has been possible to form holding companies in Connecticut. (Tr. 1428–1429). This legislation was supplemented in 1969 by the Connecticut Bank Holding Company and Bank Acquisition Act, §§ 36–418 through 430 Conn.Gen.Stats., which made it possible for banks to acquire all of the capital stock of one or more state banks or trust companies, under the supervision of the State Banking Commissioner.

196. The organization of a holding company which will acquire 25% or more of the stock of a bank must, under 12 U.S.C. § 1841(a)(2)(A), and 12 U.S.C. § 1842, receive the approval of the Federal Reserve Board after that body has obtained the opinion of the Comptroller, if the bank to be acquired is a national bank. The organization of a new bank, whether by the holding company or by others not connected therewith, must, in the case of a national bank, receive the approval of the Comptroller pursuant to 12 U.S.C. § 21 through 12 U.S.C. § 27, and, in the case of a state bank, of the state banking commissioner and the Federal Deposit Insurance Corporation. The subsequent acquisition by the holding company of the shares of the newly chartered bank must receive the approval of the Federal Reserve Board pursuant to 12 U.S.C. § 1842, supra. The use of any of the capital of an existing national bank, such as CNB, for the organization of a new national bank by means of the "holding company route", or otherwise, requires the approval of the Comptroller pursuant to 12 U.S.C. § 59. (Tr. 1558–1559).

197. Should a national bank establish a holding company, a host of permissible investment opportunities for the holding company becomes available. Pursuant to the Bank Holding Company Act Amendments of 1970, 12 U.S.C. § 1841 et seq., the Federal Reserve Board has approved for investment by bank holding companies approximately 14 activities which the board considers ". . . to be so closely related to banking or managing or controlling banks as to be a proper incident thereto." 12 U.S.C. § 1843(c)(8).[25]

198. Through their holding companies, the two large Hartford banks have invested in securities clearing houses, international banking subsidiaries, finance companies and trust offices in New York City. (Tr. 1561). Notably, neither of the two holding companies for Hartford National or CBT have invested in chartering a *de novo* bank in Connecticut, nor has any other holding company in this state. (Tr. 1255).

199. The plaintiff's Exhibit No. 90 indicates that since 1962, 22 new banks were chartered and began operating in Connecticut. During the same period, no bank holding company has been formed and chartered a new bank. (Tr. 491; P–90). According to the bank of-

---

24. For example, according to witnesses for both sides, the legal barriers to entry into New Haven, arising from the fact that it is a closed town and that regulatory approval would be necessary to obtain a charter for a new bank and to form a holding company, would require the expenditure of upwards of $2 million, even if it were feasible. (Tr. 334–5; 1555).

25. Nine of the 14 permissible activities are listed at 12 C.F.R. 224.4, and the remainder may be found in editions of the Federal Register *post* January 1, 1972. Bank holding companies may engage in these activities across state lines where state law so permits. (Tr. 1560–1561).

ficers who testified at trial, bankers tend to discount this mode of entry into their markets as "improbable" and give greater consideration to the possibility of a private group of investors chartering a new bank.

200. Any bank considering moving into New Haven by means of forming a holding company and chartering a new bank would have to consider seriously the necessity of having an office in downtown New Haven where the state's three largest commercial banks, together with FNH and Second New Haven Bank, are located. The necessity for such a location constitutes a real deterrent to any attempt to make entry. (Tr. 1458–9). To seriously compete, a new bank would also have to establish offices in other principal trading areas of the town, such as the four or five branches established by Hartford National and CBT when they entered New Haven. (Tr. 689–90; 1459–61).

201. The cost of attempting to form a holding company and chartering a new bank in New Haven would include start-up capital of approximately $2,000,-000. Other expenses of opening a new banking house and promoting the new entry would bring the total costs to about $2,500,000 for one office. To open three additional offices would cost approximately $750,000 more. (Tr. 1555).

202. Connecticut law (Conn.Gen. Stats. § 36–53) requires at least $1.5 million in capital for a new bank in a town over 50,000 people; the Comptroller recently required $2 million of capital for a new national bank in Stamford, the only new charter granted by the Comptroller in Connecticut since the 1965 ban on new charters in that state. (Tr. 689; 1554–1555).

203. Moreover, as the State Banking Commissioner testified at trial, it is highly unlikely that either CNB or FNH could form a holding company, obtain a charter for a new state bank, and then sell the newly chartered state bank to the holding company. The Connecticut State Banking Commission does not permit the chartering of a new state bank for the purpose of immediate sale to other than the local organizers. (Tr. 2153, 2157; D–7 and D–84).

204. No application for a new state bank in Connecticut has ever been granted where the new bank was to be sold to a holding company immediately upon formation. (Tr. 2154). If such an application were submitted to the State Banking Commission, accompanied by a statement that the new bank would be sold to a holding company, it would, in the opinion of the State Banking Commissioner, be "difficult" to approve the application to organize the new bank. (Tr. 2156).

205. In addition, approval of an application for a new state bank charter is far from automatic, as revealed by the statistics. Between 1962 and 1972, 32 applications for new charters were filed at the State Banking Commission; 10 were disapproved, 17 were approved and no action was taken on the remainder. (Tr. 1673; D–71).

206. Expansion via the "holding company route" would be unrealistic for CNB. This method involves (1) the formation of a holding company to own the stock of CNB pursuant to approval of the Federal Reserve Board, (2) the chartering of a new bank or banks pursuant to approval of the state banking commissioner (if the new bank were to be a state bank) or by the Comptroller of the Currency (if the new bank were to be a national bank), and (3) acquisition by the holding company of the stock of the newly organized bank(s). According to its president, after reflection about this possibility, CNB management would not consider using the holding company-new bank vehicle as a means of expansion into New Haven or elsewhere. (Tr. 688–9; 1554).

207. FNH has never given any consideration at the top management level to forming a holding company and applying for a new bank charter any-

where in the state. According to its president, the possibility of FNH following this route is remote. (Tr. 1434).[26]

## F. ACTUAL COMPETITION

### (1) *Four-Town Area*

208. An analysis of actual competition in this small area where CNB and FNH offices overlap in the towns of Ansonia, Derby, Milford and Orange, once again highlights the practical difficulties of the SMSA concept. As the plaintiff's expert witness conceded, the fact that the New Haven and Bridgeport SMSA's met between Milford and Orange complicates market definitions when focusing attention on only these four neighboring towns. (Tr. 165–6; 173; P–32).

209. For example, although the town of Orange is in the New Haven SMSA and CNB has a branch there, the plaintiff's expert witness was unable to ascribe this town to any particular banking market. (Tr. 188; P–68). Similarly, the town of Milford which is in the Bridgeport SMSA where FNH has three offices cannot be readily assigned to any definite banking market. (Tr. 189; P–65). The four-town area simply does not constitute a separate banking market, but must be considered specially for the purpose of assessing actual competition in the instant case.

210. There are 19 bank offices located in this small area. (P–63). The plaintiff's exhibits, however, do not accurately reflect the competitive strengths of CNB and FNH in these four towns. Charts which isolate and evaluate banks according to the number of offices they maintain in a small area are misleading

in terms of the relative competitive positions of the banks themselves. (Tr. 2025).

211. As of September 30, 1972, FNH held 11,942 IPC demand deposit accounts, or 18.63% of its total IPC demand deposit accounts, in towns where CNB has branch offices. (Tr. 1682; D–6 and D–73). In terms of IPC demand deposit dollars, as of September 30, 1972, FNH held $17,673,700, or 14.-19% of its total IPC demand deposits, in towns in which CNB had branch offices. (D–6). At the same time, CNB held 8,106 IPC demand deposit accounts, or 8.0% of its total IPC demand deposit accounts, in towns where FNH has offices. (D–79).

212. The defendants have offered to divest themselves of six branches in the four-town area. FNH will divest offices in Devon, Derby, and Milford, and CNB will divest its Orange and Milford offices and one of its two Ansonia offices. (Tr. 684–6). Contracts for three of the six branches have been signed, and considerable interest has been expressed by other banks in the three remaining branches. (Tr. 685, 688). In the opinion of the defendants' prospective president, the sale of the three branches not yet under contract could be accomplished within a one-year period. (Tr. 688).

213. The branches presently under contract are the CNB branch in Orange which is to be sold to a newly organized bank, Nutmeg Trust Company; CNB's Milford branch, which will be sold to Hartford National; and FNH's Derby branch, which will be acquired by CBT. (Tr. 838; 1302–1303).

214. The defendants have offered to accomplish the divestiture of the six

---

26. A memorandum (P–99) on the subject of FNH expansion, entitled "We have a Plan," was prepared by two of FNH's vice presidents and mentioned the possibility of expanding via the holding company route but received a "pocket veto" in the office of the president of FNH. (Tr. 1463–4). This document (according to its authors) was essentially an attempt to suggest alternatives in view of the rapidly escalating costs of *de novo* branching and was seen by them as a trial balloon to test the senior management's receptivity to their ideas on the subject of innovative expansion. FNH's chief executive officer testified that he viewed the draft as primarily a research study which did not merit careful attention at the time. It was never shown to the executive committee of FNH or to its Board of Directors. (Tr. 1463–4).

branches through the filing of a merger application by the acquiring bank under the provisions of the BMA. Pursuant to this procedure, accounts of record at the selling offices would transfer by operation of law to the acquiring bank. (Tr. 687, 843–844; 857). Counsel for the defendant banks have assured the Court that the contracts under which branches in the four-town area are to be sold are arm's length business transactions and contain no agreement between buyer and seller which would inhibit future competition between the two. (Tr. 844–845).

### (2) *After Divestiture*

215. After divesting these three offices, the consolidated bank will be left with one office in Orange, one office in Milford, and one office in Ansonia. (Tr. 839–840). When all six branches scheduled to be divested are sold, FNH will have only 779 accounts, or 1.32% of its total IPC demand deposit accounts, in towns where CNB has offices. (D–6).

216. After the divestiture of all six offices, the consolidated bank will have substantially less in deposits in that area than FNH alone before divestiture. (D–2). CNB will retain 1,724 IPC demand deposit accounts, or 1.9% of its total IPC demand deposit accounts, in towns where FNH has offices. (D–3).

217. The divestiture of the three branches now under contract will have a procompetitive impact inasmuch as the two one-billion dollar Hartford banks will be introduced into an area where they presently do not have branches. The third branch under contract will be sold to another new entrant in the four-town area. (Tr. 1820, 1823).

218. When all six branches are divested, six new entrants will appear in the four-town area. (Tr. 686). As the plaintiff's expert witness testified, the effect of defendants' divestiture commitments will be beneficial to the banking public, assuming that deposits at the offices to be divested continue to be held by the divestee banks. (Tr. 263–268).

219. As another result of the divestiture, the geographic proximity ranking of certain potential entrants will change. The three branches under contract of sale in Orange, Milford, and Derby and the nearby towns of Shelton, West Haven and Trumbull will be affected. For example, in Shelton, CNB is already present in the town and FNH is ranked first in geographic proximity because of its branch in Derby. Since the Derby branch is under contract of sale to CBT, CBT will inherit FNH's position as being closest by geographic proximity to Shelton. (Tr. 1304). The divestiture of FNH's Milford office to Hartford National will cause the latter to succeed to FNH's third place geographic ranking in the town of Stratford. (Tr. 1306).

220. Since these towns in and around the divestiture area are relatively small in population, the geographic proximity of potential entrants is more important. Consequently the effect of the sale of these branches will be very significant in potential competition terms.

221. In addition, divestiture of the six branches will free a sizeable amount of capital to assist the consolidated bank in entering new towns such as Hartford or New London. (Tr. 1571). With respect to CNB alone, the divestiture will return approximately $1,500,000 in resources. (Tr. 1569).

222. The Regional Administrator testified that when reports are submitted to banking regulatory agencies on the competitive factors involved in a proposed merger pursuant to 12 U.S.C. § 1828(c)(4), the Department of Justice has taken into account divestiture proposals by the merging banks. (D–68).

223. Precedent for the divestiture of branches as a condition of merger can be found in a consent judgment entered into by the Department of Justice on December 7, 1970, by which the defendants, National Bank and Trust Company of Central Pennsylvania, et al., were allowed to merge following the divestiture of nine branches. (Tr. 855; D–67).

224. Once the divestiture is carried out, in accordance with the terms outlined at trial, the Court is of the opinion that banking conditions in the four-town area will improve with a healthy increase in actual competition.

## G. EFFECTS OF PROPOSED CONSOLIDATION

### (1) *Triggering of Other Mergers*

225. A prediction that future mergers will take place among the ten largest banks in Connecticut requires a prediction of the action to be taken by several different government regulatory agencies on the merger application, as well as a prediction of the action to be taken by the courts if the merger is challenged by the Justice Department. (Tr. 1165–1166).

226. Although the plaintiff advanced such a prediction, no evidence was produced which showed that the proposed consolidation would have the probable effect of triggering other mergers among Connecticut's ten largest banks. The plaintiff's expert economist stated only that such triggering is a "possibility" and that it "might" occur. (Tr. 197–198). Moreover, counsel for the plaintiff was unable to suggest which particular mergers, if any, may take place among the ten largest Connecticut banks as a result of approval of the proposed consolidation. (Tr. 1407).

227. Dr. Peck expressed his expert opinion that mergers in the foreseeable future were unlikely between: any of the three largest banks in Connecticut with any other bank ranking among the top ten [27]; State National Bank of Connecticut and City National Bank or Colonial Bank and Trust Company; or City National Bank and Colonial Bank and Trust Company, because substantial existing competition between these banks would be eliminated thereby. (Tr. 1408–9).

228. During the course of the trial, several Connecticut bank officers testified concerning the possibility of mergers within and affecting their respective institutions. The president of the State National Bank of Connecticut, who was called by the plaintiff, stated his bank had not participated in any recent merger discussions with any of Connecticut's ten largest banks. (Tr. 616–7). FNH's president testified that any such discussions held by FNH during the last few years were conducted because it was known that Hartford National and CBT were about to enter New Haven. (Tr. 1501–2).

229. The influence and pressure of the growing Hartford "giants" is amply clear. Another of the defendants' expert witnesses, Professor Stokes, stated emphatically that the proposed consolidation would not serve to increase significantly the already intense pressures on Connecticut banks to respond to the competitive dominance of CBT and Hartford National. (Tr. 1105–7).

230. The Court concludes that this proposed consolidation would mean more competitive choices for the people of Connecticut and a more healthy and balanced banking structure of five or six strong and relatively equal competitors. (Tr. 979). Approval of the consolidation even if it is followed by one or two additional mergers or comparable transactions does not constitute "triggering" a merger movement, since it must be remembered that each bank merger must be submitted for prior approval by a bank regulatory agency and reviewed by the plaintiff. (D–85 through 88).

### (2) *Procompetitive Impact*

231. As the plaintiff has conceded, the pre-existing *de facto* distinct structure of competition in Connecticut banking with no state-wide banks was not a particularly healthy situation. Since the acquisitions by CBT and Hartford National in Fairfield and New Haven Counties and the creation of Union Trust, the entire competitive structure

---

27. With Second New Haven National Bank being the only possible exception noted. (Tr. 1409).

of banking in Connecticut has changed. (Tr. 666). There are now three state-wide banks in Connecticut.[28]

232. A healthy banking system in the State of Connecticut should have as its nucleus more banks with state-wide representation. (Tr. 983; 986). Both the people of Connecticut and the state's business community would then have a choice among a larger range of banks of similar capacity. (Tr. 983). However, the existence of more state-wide banks in Connecticut would not mean that there would be fewer banks remaining in the state. Generally, small banks have done quite well, and their number continues to increase. (Tr. 1010–1).

233. The Regional Administrator recommended approval of the proposed consolidation because the resultant bank would have the capacity to compete more substantially with the two large Hartford banks and thereby create a "better balanced banking structure" for the State of Connecticut. (Tr. 1821–2). In addition, the market area of Union Trust, the state's third largest bank, virtually coincides with the market area of the consolidated bank. Approval of the consolidation would increase competition between the consolidated bank and Union Trust in this common market area. (Tr. 1902).

234. Moreover, the consolidation would improve the competitive banking structure in Fairfield and New Haven Counties and give the resulting bank the opportunity to move in the direction of establishing itself as a state-wide competitor. (Tr. 797).

235. Upon questioning by the Court, even the chief officer of one of the defendants' competitors who was called as a witness by the plaintiff, acknowledged that the two Hartford banks and Union Trust will have an exclusive franchise in Connecticut if banks of defendants' size are not permitted to merge. (Tr. 664–6).

236. Rather than entrench either of defendants in any part of their respective service areas, the proposed consolidation, giving effect to the divestiture, will have the procompetitive effect of introducing Hartford National and CBT to the towns of Derby and Milford and of providing the consolidated bank with the capacity to enter Hartford and New London, thereby adding consumer alternatives in two areas where the Hartford banks are dominant. (Tr. 982; 2001; D–2).

237. Although neither defendant independently is a likely entrant into Hartford or New London, the Hartford area would be attractive to the consolidated bank because it has the highest concentration of deposits of temporarily idle funds in the state and the area around New London and Groton is experiencing major growth. The president-designate of the consolidated bank testified that expansion into these areas was probable. (Tr. 807–9; 1494–5).

238. The plaintiff's expert agreed that, if the consolidation takes place, the resulting bank will be more likely to enter Hartford because of its greater size. (Tr. 305). The consolidated bank would have a greater financial ability and a better opportunity to enter the Hartford area than either of the defendant banks alone. (Tr. 1470–2, 1474).

239. The price-earnings ratio of the stock of the consolidated bank would be higher than the ratio of either of the defendants separately and approximately on a par with the price-earnings ratio enjoyed by CBT, Hartford National and Union Trust. (Tr. 1566–7). Moreover, the capital realized by the consolidated bank through sale of the branches under contract of sale would make capital available for the purpose of entering Hartford. (Tr. 1571).

240. The plaintiff's expert witness also testified that new entrants, such as the consolidated bank, would deconcentrate banking in both Hartford and New

28. Union Trust is not yet strictly speaking state-wide, but it has been identified by the Regional Comptroller as having that potential.

London, which is the largest town in eastern Connecticut. (Tr. 532). This witness further stated that it would certainly be procompetitive if the consolidated bank were to enter New London, which is presently highly concentrated. (Tr. 417). The consolidated bank would be more able to engage the three largest commercial banks in competition in the New London market than either of the defendant banks individually given their present size. (Tr. 1325).

## H. CONVENIENCE AND NEEDS OF THE COMMUNITY

241. The plaintiff's expert witness conceded that mergers often assist the local customer in that the risk of loss is less, meaning that a larger bank can be more accommodating to local retail customers. (Tr. 202).

242. The consolidation of the two defendant banks would make available a broader range of banking services to the entire banking public, including the individual homeowner, the small businessman-proprietor and the corporate customer. The resultant bank would provide the public with additional and more sophisticated choices in the areas of trust services, international services, computer services, municipal financial services to Connecticut cities and towns, and higher lending limits. (Tr. 1822).

243. In reviewing and recommending approval of this proposal, the Regional Administrator considered the financial and managerial resources and future prospects of the existing and proposed institutions and the convenience and needs of the community to be served. (Tr. 1945). In his report, Examiner Veronneau found that the consolidation would provide the resulting bank with the opportunity to compete more effectively and enable it to better maintain a competitive balance. (Int–4).

### (1) Lending Limits

244. With the influx of many large corporate headquarters into southern Connecticut, lending limits of local banks have become increasingly important. (Tr. 660). When a corporation's credit needs are in excess of a bank's lending limit, it is necessary to arrange for participations whereby other larger banks provide the excess portion of the credit request. (Tr. 775–6). And if a local bank has to seek a larger bank's participation in a loan, the larger bank is introduced to the customer of the local bank which runs a substantial risk of losing the account. (Tr. 2034).

245. Convenience is a factor even for large corporations which prefer to deal with local banks if possible. (Tr. 1883; 2051–2). The principal reasons why the corporate borrower attempts to use only one bank for its loans are convenience in negotiation and in maintaining compensating balances, and the possible savings on the amount of such balances. (Tr. 2051–2). Historically, as the defendant banks' corporate customers have become larger, their account relationships with the local banks have declined in significance. (Tr. 774–5).

246. A large share of the available and most desirable corporate banking business in Connecticut is leaving Connecticut. (Tr. 2032). The lending limit of each of the six largest New York City banks and First National Bank of Boston, which all make loans to businesses and solicit business in New Haven, is substantially in excess of FNH's lending limit. (Tr. 1443–4).

247. FNH has lost a substantial amount of business from corporate customers who have found it necessary to deal elsewhere in order to obtain higher lending limits. (Tr. 1440; 1448; D–60). And CNB has become less important to many of its own long-time customers because of the bank's inability to keep up with the growth of their financial needs. (Tr. 774–5). CNB is simply not large enough to serve as the lead bank for any of the many corporations which have moved into Fairfield County in recent years. (Tr. 773).

248. Present customers of both CNB and FNH have had to seek banks located

elsewhere, including New York City, to satisfy their loan requirements. Some of these customers who testified at trial, indicated that they would avail themselves of the consolidated bank's increased lending limit and would prefer to do their banking locally if at all possible. (Tr. 2039, 2041; 2062, 2064–5; 2111–2; 2175).

249. The present legal lending limit of CNB is $2.8 million. As a matter of prudent banking practice, CNB does not lend more than $2.25 million to any one customer. FNH's legal lending limit is $2.3 million, but FNH also does not lend more than $1.7 million to any one customer. (Tr. 678). The consolidation of the two banks will combine their legal lending limits, for a total of $5.1 million. (Tr. 1697).

250. CNB and FNH also have compensating balance requirements for corporate accounts amounting to 10% of a line of credit without any borrowing and 15% to 20% of the outstanding loan balance when there is a borrowing. (Tr. 830; 1697). Presently, CNB has a loan to deposit ratio of approximately 61% which indicates that CNB has the capacity to utilize an increased lending limit. (Tr. 829, 864).

251. The legal lending limits of each of the two large Hartford banks approximates $9 million, several times greater than the lending limits of each defendant. (Tr. 1795). Seventeen of the 25 large corporations listed in the Special Master's report had $6.0 million in loans and about $4.0 million in deposits with CBT and Hartford National. (D–60, pp. 26–7).

252. Some specific instances which were brought to the Court's attention during trial will serve to illustrate the present deficiencies of the individual defendant banks with respect to their legal lending limits. A large apparel manufacturer in Bridgeport is presently borrowing $2 million from CNB, only

$250,000 short of CNB's lending limit. The company must go outside Connecticut to obtain the remainder of its financing, although company policy favors the use of Bridgeport banks to the greatest extent possible. (Tr. 2123–2124, 2129).

253. A leading East Coast scrap metal dealer with headquarters in New Haven has found it necessary to establish lines of credit at First National Bank of Boston, because the New Haven bank with which it deals does not have an adequate lending limit. To obtain sufficient funds for its export business, this company must go to Irving Trust Company in New York. While the company expects to continue relationships with First National Bank of Boston, it would prefer to obtain its principal financing from New Haven banks if there were no lending limit problem.[29] (Tr. 2080).

254. FNH was unable to supply a local manufacturer's loan needs in the late 1960's, and as a result the corporation had to establish a relationship with Irving Trust Company of New York City. (Tr. 2038; 2045). In 1970, the same manufacturer found it necessary to deal with a larger bank in addition to FNH when his company was in the process of refinancing a debt and seeking working capital. (Tr. 2039).

255. A paperboard manufacturer in New Haven was not able to obtain from FNH all the funds it needed to purchase another paperboard company. As a result, it was necessary to have the loan participated with First Pennsylvania Company, which necessitated six trips by company management to Philadelphia. (Tr. 2111–2112; 2117). This manufacturer would prefer to obtain his funds locally, since his main office is located in New Haven and convenience is an important factor to him. (Tr. 2112–2113).

256. General contractors in Connecticut need interim financing for "turn-

---

29. At present, the New Haven scrap metal dealer utilizes about $5 million in working capital, a sum which is comparable to the lending limit of the consolidated bank. (Tr. 2082).

key" construction projects and few, if any, have internal funds to finance such transactions. About 85% of such projects have been public housing projects including six or seven in New Haven alone within the last three years. The cost of such projects is typically more than $2 million, an amount which FNH cannot satisfy. If the bank had attempted to finance such projects, it could not have handled the general contractor's other financial needs. (Tr. 2064–5).

257. Since FNH is not of sufficient size to offer equipment leasing services, contractors who deal with it must purchase the necessary equipment, with financing provided by FNH. Construction equipment is very expensive, however, and much of FNH's lending limit is quickly absorbed by this financing. Consequently, a contractor cannot borrow from FNH adequate additional funds to use as working capital. (Tr. 2063).

258. One manufacturer noted that when FNH and Irving Trust Company participated in a loan to his company, he was required by the traditional informal agreement between banker and customer to maintain "compensating balances" at both banks. (Tr. 2039). Making arrangements with other banks to participate in a loan can be quite difficult in times of "tight money", when the entire banking system is strapped for funds. At such times, a higher lending limit will provide greater assurance that the customer's loan needs are satisfied, without the necessity of resorting to participations with other banks. (Tr. 1887–1888).

259. The presence of a bank or banks with adequate lending limits may have a significant impact on the economy of the community. Pursuant to standard banking practice, corporate loan customers must at all times maintain at the lending bank deposits equivalent to a certain percentage of their loan. Such "compensating balances" kept on deposit are generally equivalent to 10% to 20% of the loan.

A bank which can double its lending limit will be able to retain on deposit twice as much in "compensating balances". These "compensating balances" can be plowed back into the community in the form of new corporate loans for plant and equipment, a process which in turn creates more jobs for local residents, higher disposable income, higher retail sales, etc. Or said balances may be used to make personal and installment loans to individuals. (Tr. 1697–8).

260. Thus, while the higher lending limit available to the combined bank after the consolidation will assist the bank in increasing the size of its loans to large corporations, the amount of lendable funds available to smaller borrowers will not be reduced but will, in fact, be increased. (Tr. 862–864).

261. It is clear that with the resulting bank's increased lending limit, it could compete more forcefully for the larger local corporate accounts with the larger Hartford and New York City banks. (Tr. 826–7). It would also obviate the need to arrange for complicated participations. The Court considers it particularly significant that the plaintiff's expert witness conceded that continued expansion by the defendant banks by means of *de novo* branching would not result in the furnishing of higher lending limits or more sophisticated banking services demanded by commercial customers in the Bridgeport-New Haven areas. (Tr. 584–585).

(2) *International Services*

262. There is a clear-cut need in Fairfield and New Haven and other counties in Connecticut for international banking services. (Tr. 1877; 2077–2078). A large percentage of the international business available in Connecticut comes from the medium-sized corporate customer. Hence it is inaccurate to suggest that only international and large national corporations in Connecticut participate in international trade. (Tr. 1896).

263. The Connecticut Development Commission has estimated that exports

from the State of Connecticut will quadruple by 1980; and, as the combined banks' president-designate testified, this fact will play at important part in the consolidated bank's planning. (Tr. 778). In addition, the headquarters for the United States Bureau of Customs is located in Bridgeport. This indicates that an important volume of business in international banking services is being conducted in the defendants' own backyard, which is now known to be handled by the two large Hartford banks. (Tr. 778–779).

264. CNB has just started an international banking group which employs one man. (Tr. 821). FNH now owns 50% of an international banking subsidiary, similar to that formed by First National Bank of Boston, but has not been able to put it into operation. Personnel problems, as well as the difficulties attendant upon a relatively small bank entering a sophisticated field, have hampered start-up. Its only business is a single lease on motel equipment in Canada. In contrast, the two large Hartford banks have dealt in international banking services for some time. The New York banks are professionals in this field and have employed their resources in the New Haven area to lure away customers of the defendant banks. (Tr. 1467–1470).

265. Hartford National and CBT are heavily involved in international banking. CBT has 29 people in its international department; its annual report indicates that the bank has men travelling the world. Hartford National is a member of the Allied Bank International, which is a consortium of banks set up entirely for international banking business. (Tr. 779).

266. Following the merger of Fairfield County Trust Company and Union and New Haven Trust Co. (to form Union Trust) in October 1969, the resulting bank was able to develop an international department, which neither bank had prior to the merger. According to its chief executive officer, Union Trust would not have been able to organize this new department without the merger. (Tr. 1877).

267. Since credit information on foreign customers is not available in adequate quantity from New Haven banks, a New Haven scrap metal dealer resorted to Irving Trust Company and First National Bank of Boston for advice in this area. The international banking department of the First National Bank of Boston and its international banking subsidiary conducted a study of the steel-making capacity of Brazil and arranged communications with an Argentinian concern thereby opening up new business opportunities for the scrap dealer. (Tr. 2083). As its representative testified at trial, the company would prefer to do this business locally and would utilize a larger international department at the consolidated bank. (Tr. 2075–2077; 2084).

### (3) *Computer Services*

268. Several local businessmen testified that there is a need for bank computer services in the New Haven area. (Tr. 2066). Yet, computer equipment is very expensive and a bank must have fairly substantial resources to acquire it. The benefits of computers do filter down to the customer inasmuch as computers assist the bank in performing customer services. (Tr. 660).

269. FNH lost the account of a New Haven construction company for computer services because FNH had neither the personnel nor the equipment to satisfy the sophisticated requirements of payroll processing. (Tr. 2066). More extensive computer services would also be of assistance to a Bridgeport-based manufacturing concern which presently must go to Chemical Bank in New York for this service. Both of these companies would find it more convenient to get these services locally. (Tr. 2128).

270. The only Connecticut bank that presently can offer pre-encoding services is one of the large Hartford banks. (Tr. 2097). The Knights of Columbus,

a New Haven fraternal order, has sought a bank in the New Haven area which has the computer capacity to pre-encode certain items for clearance in the nation's check clearing-house system. If this pre-encoding could be performed by a New Haven bank, K of C would be able to make available a "pre-authorized check plan" to its 15,000 Connecticut policyholders. Such a plan would confer substantial benefits upon both K of C and its Connecticut policyholders. The consolidated bank is hoping to offer the pre-encoding services sought by K of C. (Tr. 2095-2098; 2102).

271. After the consolidation, the resultant bank would be better able to offer to both large and small businesses an expanded array of computer services. These services would include forecasting, profit planning and cash flow forecasting. (Tr. 834-835; 674; 1467; 1822).

#### (4) *Trust Services*

272. There is a need for more sophisticated trust services in the Bridgeport and New Haven area. Individuals whose net worth is greater than the capital of a bank naturally prefer to place their substantial trusts only with large and well capitalized banks for reasons of security. There are many such individuals in Connecticut. (Tr. 655).

273. A representative of the Knights of Columbus, testified that his organization suffers somewhat today for being without the trust and investment services provided by New York's Chemical Bank, where K of C banked for many years until severe inconvenience, expense, and civic pride persuaded it to switch to a bank in New Haven. (Tr. 2093). Even the Hartford banks are not a convenient alternative. (Tr. 2105).

274. Union Trust, as a bigger bank, can offer considerably better trust investment services than FNH. For this reason, one New Haven organization maintains its employee's trust at Union Trust, even though the organization's president is on the FNH board of directors. (Tr. 2106-2107).

275. A larger trust department at the consolidated bank would also relieve a corporate customer of its present anxiety about CNB's trust department. The consolidated bank would be able to develop adequate management succession in the trust department to assure adequate service in the future for this company's pension plan. (Tr. 2126).

276. Another New Haven manufacturer testified that he would like to consider the consolidated bank's trust department as a source of investment counseling for his company's three pension plans. The company is now investigating the feasibility of seeking outside investment advice to replace its present in-house counsel. (Tr. 2114).

277. In recommending approval of the proposed consolidation, one of the factors which the Regional Administrator took into account was the improved trust services which the resultant bank would be able to provide to the New Haven-Bridgeport area and the recognized need for such services. (Tr. 1822).

#### (5) *Other Important Services*

278. Municipal financing services are vital to municipalities that wish to market their short-term debt issues. Banks also serve municipal bodies by acting as certifying and paying agents for municipal bond issues, bidding for certificates of deposit, and providing counsel for municipal investments. (Tr. 698-699).

279. Operation of an active municipal loan department is an important means by which commercial banks attract municipal deposits. (Tr. 698-9). CNB has a one-man municipal financing department and this man is also responsible for the bank's entire investment portfolio. (Tr. 831). The two Hartford banks dominate the municipal financing business in Connecticut. (Tr. 674, 699, 832).

280. The officers of the proposed consolidated bank have developed specific plans to increase municipal services to

Connecticut's cities and towns and place more emphasis on that aspect of their operations. (Tr. 699, 674; 1467).

281. The local businessmen who testified at trial expressed a definite need for a bank in the New Haven-Bridgeport area that could handle stock transfer work. A New Haven paperboard manufacturer, whose stock is traded on the American Stock Exchange, maintains Hartford National Bank as its transfer agent, because FNH is not now qualified to transfer stock on the American Exchange. (Tr. 2115).

282. According to its designated president, the resultant bank would be interested in stock transfer work for companies whose stock is registered on the major stock exchanges. (Tr. 674).

283. CNB's present corporate services consist of only one man who calls on corporate customers but who is not able to offer what is needed by Bridgeport corporations in the way of corporate services. (Tr. 2126–2127). For example, CNB does not offer lock box services, through which a bank picks up from post office lock boxes checks made out to the bank's customer, deposits the checks to the customer's account at the bank, and then sends photocopies of the checks to the customer for record-keeping purposes. (Tr. 2124–2125).

284. CNB is not large enough to have access to the bank wire, by which a corporation's funds can be transferred between banks in different parts of the country. This service is important to some larger Bridgeport companies, which daily transfer money from banks situated near their manufacturing plants in other parts of the country, to CNB. (Tr. 2125).

285. No bank in Bridgeport is large enough to offer adequate advice to their corporate customers on the issuance of stock. A larger bank in the community would be of great assistance to Bridgeport companies in this area, and would provide a more convenient alternative than the New York banks. (Tr. 2127).

286. FNH was found lacking in experience in handling tender offers, through which corporations acquire other companies, in the opinion of one local businessman who testified at trial. (Tr. 2112). Another New Haven businessman went to New York and Boston banks to get advice on business opportunities because in his opinion FNH is unable to render sufficient advice in this area. (Tr. 2078).

287. Another representative of the New Haven corporate management community testified that his company turns to New York banks for advice on prospective acquisitions. (Tr. 2041). However, this witness expressed the belief that the consolidated bank would be very helpful in this respect, because as a larger bank, it would automatically develop a large number of contacts with persons who may wish to sell their companies. (Tr. 2042; 2056–7).

288. The officers of the proposed consolidated bank are certain they can improve the quality of corporate services offered to the public throughout the state. (Tr. 1467).

289. Banks, whether small or large, are composed of people, and it is the person or persons in the bank or branch that service the public and reflect the bank's character. If the people in the bank or branch, regardless of the bank's size, are cold and unconcerned the bank won't service the local businessmen. (Tr. 657, 663). Capable personnel are vital to a bank's competitive effort and to its service to the community. (Tr. 661; 982).

290. The size of a bank is an important factor in being able to provide advanced computer, international, municipal financing and trust services, and in being able to attract the highly qualified professional personnel necessary to provide such services. (Tr. 661).

291. This observation was confirmed by the experience of Union Trust which according to its president found that, after the merger of Union New Haven Trust Company and Fairfield County

Trust Company, the merged bank attracted more capable personnel. (Tr. 1878).

292. The new and improved services that would be available from the consolidated bank including specialized trust, municipal, computer and international services would certainly require increasing personnel sophistication. The resulting bank hopes to be able to bring new depth and talent in terms of specialized personnel to the performance of such services. (Tr. 1467–8).

293. In light of all the above evidence, the Court concurs with the plaintiff's expert witness that at least in this particular antitrust case, bigness is not equivalent to badness. (Tr. 204).

## II. CONCLUSIONS OF LAW

### A. THE RELEVANT STATUTES AND STANDARDS

The applicable statutes are Section 7 of the Clayton Act, 15 U.S.C. § 18, and the Bank Merger Act of 1966. Section 7 provides in pertinent part:

No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any *line of commerce* in any *section of the country,* the effect of such acquisition may be *substantially to lessen competition,* or to tend to create a monopoly. [Emphasis added.]

The applicable parts of the BMA as set forth in 12 U.S.C. § 1828(c), state:

(5) The responsible agency [in this case, the Comptroller] shall not approve—

(A) any proposed merger transaction which would result in a monopoly, or which would be in furtherance of any combination or conspiracy to monopolize or to attempt to monopolize the business of banking in any part of the United States, or

(B) any other proposed merger transaction whose effect in any section of the country may be substantially to lessen competition, or to tend to create a monopoly, or which in any other manner would be in restraint of trade, unless it finds that the anticompetitive effects of the proposed transaction are clearly outweighed in the public interest by the probable effect of the transaction in meeting the convenience and needs of the community to be served.

In every case, the responsible agency shall take into consideration the financial and managerial resources and future prospects of the existing and proposed institutions, and the convenience and needs of the community to be served.

\* \* \* \* \* \*

(7)(A) Any action brought under the antitrust laws arising out of a merger transaction shall be commenced prior to the earliest time under paragraph (6) at which a merger transaction approved under paragraph (5) might be consummated. The commencement of such an action shall stay the effectiveness of the agency's approval unless the court shall otherwise specifically order. In any such action, the court shall review de novo the issues presented.

(B) In any judicial proceeding attacking a merger transaction approved under paragraph (5) on the ground that the merger transaction alone and of itself constituted a violation of any antitrust laws other than section 2 of Title 15, the standards applied by the court shall be identical with those that the banking agencies are directed to apply under paragraph (5).

\* \* \* · \* \* \*

■■ There is no question that bank mergers are subject to the competitive standards of Section 7 of the Clayton Act. BMA 1966; United States v. First City National Bank of Houston, 386 U.S. 361, 87 S.Ct. 1088, 18 L.Ed.2d 151 (1967). The function of the court in a

bank consolidation case is to make a complete *de novo* review of the transaction to determine whether it has anticompetitive effects and, if so, whether the merger's benefits to the community outweigh its anticompetitive disadvantages. United States v. Third National Bank in Nashville, 390 U.S. 171, 88 S.Ct. 882, 19 L.Ed.2d 1015 (1968).

 The burden of proving the reasonable probability of a substantial lessening of competition is upon the Department of Justice as plaintiff. United States v. Philadelphia National Bank, 374 U.S. 321, 363, 83 S.Ct. 1715, 10 L. Ed.2d 915 (1963). On the other hand, the merging banks as defendants have the burden of proving the "convenience and needs of the community" defense. *Houston,* supra, 386 U.S. at 366, 87 S.Ct. 1088.

With respect to the degree of proof in a Section 7 case, the Supreme Court stated in Brown Shoe Co. v. United States, 370 U.S. 294, 323, 82 S.Ct. 1502, 1522, 8 L.Ed.2d 510 (1962):

. . . Congress used the words "may be substantially to lessen competition" to indicate that its concern was with probabilities, not certainties. Statutes existed for dealing with clear-cut menaces to competition; no statute was sought for dealing with ephemeral possibilities. Mergers with a probable anticompetitive effect were to be proscribed by this Act . . .

See also United States v. E. I. duPont de Nemours & Co., 353 U.S. 586, 607, 77 S. Ct. 872, 1 L.Ed.2d 1057 (1957); United States v. International Telephone & Tel. Corp., 324 F.Supp. 19, 30–31 (D.Conn. 1970).

 There is no requirement that "the [reasonably probable] anticompetitive power manifest itself in anticompetitive action" before Section 7 comes into play. Federal Trade Commission v. Procter & Gamble Co., 386 U.S. 568, 577, 87 S.Ct. 1224, 1229, 18 L.Ed.2d 303 (1967). Indeed, "the very wording of § 7 requires a prognosis of the probable *future* effect of the merger." *Brown*

*Shoe Co.,* supra, 370 U.S. at 332, 82 S. Ct. at 1528 (emphasis original); *Philadelphia,* supra, 374 U.S. at 362, 83 S.Ct. 1715.

The issues in this case concern: 1) "line of commerce," 2) "section of the country," 3) "effect of the merger on competition," and 4) the applicability of the "convenience and needs" exception.

## B. LINE OF COMMERCE

The plaintiff contends that as a matter of law "commercial banking" is the relevant product market within which to assess the competitive effects of the merger of the defendant banks. It finds strong support for its position in a series of Supreme Court decisions which stressed that the broad cluster of financial products and services offered by commercial banks sets these banks apart from all other financial institutions.

In *Philadelphia,* supra, 374 U.S. at 356, 83 S.Ct. at 1737, Mr. Justice Brennan wrote:

[T]he cluster of products (various kinds of credit) and services (such as checking accounts and trust administration) denoted by the term "commercial banking" * * * composes a distinct line of commerce.

And in United States v. Phillipsburg Nat. Bank, 399 U.S. 350, 360–361, 90 S. Ct. 2035, 2041–2042, 26 L.Ed.2d 658, the Court held:

*Philadelphia Bank* emphasized that it is the *cluster* of products and services that full-service banks offer that as a matter of trade reality makes commercial banking a distinct line of commerce. Commercial banks are the only financial institutions in which a wide variety of financial products and services—some unique to commercial banking and others not—are gathered together in one place. The clustering of financial products and services in banks facilitates convenient access to them for all banking customers. For some customers, full-service banking makes possible access to certain prod-

ucts or services that would otherwise be unavailable to them; the customer without significant collateral, for example, who has patronized a particular bank for a variety of financial products and services is more likely to be able to obtain a loan from that bank than from a specialty financial institution to which he turns simply to borrow money. In short, the cluster of products and services termed commercial banking has economic significance well beyond the various products and services involved.

See also United States v. First National Bank & Trust Co. of Lexington, 376 U.S. 665, 84 S.Ct. 1033, 12 L.Ed.2d 1 (1964).

In addition, the plaintiff claims its factual presentation supports the contention that, in Connecticut, commercial banks offer many services for which mutual savings banks and other financial institutions offer little or no competition. For example, it is pointed out that savings banks offer little or no competition with respect to demand deposits, non-real estate loans, commercial and industrial loans, fiduciary accounts, and other personal and corporate services. Moreover, Connecticut has separate home office protection laws applicable to mutual savings banks, and interlocking directorates are not illegal. (But see Finding 58).

On the other hand, countervailing legal and factual arguments persuade this Court that, while other financial institutions may not be significant in determining the appropriate line of commerce in the instant case, savings banks are in direct and substantial competition with commercial banks in providing product-services to the banking consumers in Connecticut. The cold, hard realities of the situation are that savings and commercial banks are fierce competitors in this state.

The proof was ample that meaningful competition between the two types of banks exists in the following significant areas of the banking business:

1. Personal checking accounts (Findings 52–56).
2. Real estate mortgages (Findings 36, 46).
3. Personal loans (Findings 36, 57).
4. IPC deposits (Findings 47–51).
5. Commercial loans (Finding 45).

There is little question that the statistical evidence demonstrates a high degree of comparability between savings and commercial banks in the areas of operating income, level of earnings, loans, income from securities, and service charges. (Finding 43). Further, the evidence was clear that the two types of banks compete directly for personnel and branch sites. (Findings 37, 45).

Compelling, also, are the attitudes of federal and state bank regulatory agencies on the question of competition between savings banks and commercial banks. Both the Comptroller and the Connecticut State Banking Commission require detailed information concerning savings banks in their consideration of applications for new commercial banks and branches. (Findings 38–9). It is also noteworthy that the Department of Justice has recently filed suit in Texas to prevent the merger of a commercial bank and a savings and loan association on the theory that substantial existing competition will be eliminated. United States v. The Fort Worth National Corporation and Mutual Savings and Loan Assoc., CA–4–1827 (N.D.Tex. Sept. 14, 1971).

In the Court's view, the Supreme Court's pronouncements in *Philadelphia* and *Phillipsburg* on the subject were not intended to be ironclad, hard and fast rules which require a court to don blinders to block out the true competitive situation existing in every set of circumstances. Lower courts have split on the issue. See, e. g., United States v. First National Bancorporation, Inc., 329 F.Supp. 1003, 1011–1012 (D.Colo.1971); United States v. Idaho First National Bank, 315 F.Supp. 261, 267–268 (D.Idaho 1970); United States v. Crocker-An-

glo National Bank, 277 F.Supp. 133, 151–153 (N.D.Cal.1967).

A careful review of the leading cases convinces this Court that it should adopt and apply the lucid reasoning concerning this legal question set forth in *Idaho First National,* supra, 315 F.Supp. at 267–268; United States v. Provident National Bank, 280 F.Supp. 1, 7–9 (E.D.Pa.1968); and *Crocker-Anglo,* supra, 277 F.Supp. at 153–169. This opinion is buttressed by 1) the Supreme Court's ruling in United States v. Continental Can Co., 378 U.S. 441, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964), wherein it was held that Section 7 is not limited to identical products and that in a proper case the district court should consider the competition between two institutions even where complete industry overlap is not demonstrated; 2) the omission in the BMA of 1966 of the phrase "in any line of commerce"; and 3) the obvious distinguishing factors between Connecticut's banking market structure (direct and substantial competition between savings banks and commercial banks) and the market structures under analysis in *Philadelphia* (inconsequential competition between the two institutions) and in *Phillipsburg* (no savings bank competition at the time).

Accordingly, this Court concludes that, under all the credible evidence produced at trial, the appropriate "line of commerce" in the Connecticut banking environment includes both commercial banks and savings banks.

## C. SECTION OF THE COUNTRY

In order to measure either actual or potential competition the Court must determine the relevant geographic market area which constitutes a "section of the country" within the meaning of the Clayton Act and the BMA 1966.

In merger cases the market area must "both 'correspond to the commercial realities' of the industry and be economically significant." *Brown Shoe,* supra, 370 U.S. at 336, 82 S.Ct. at 1530. The Court must strive for a workable compromise that avoids the extremes of "drawing the market either so expansively" as to take into account "only the very largest bank customers," or "so narrowly as to place [the merging banks] in different markets, because only the smallest customers are considered." *Philadelphia,* supra, 374 U.S. at 361, 83 S.Ct. at 1740. No litmus test is available; the Court must attempt to charter, on the basis of the evidence before it, "the market area in which the seller operates, *and to which the purchaser can practicably turn for supplies.*" *Id.* 374 U.S. at 359, 83 S.Ct. at 1739 (emphasis original).

The plaintiff contends that there are several "sections of the country" in which the proposed consolidation will substantially lessen competition: various Standard Metropolitan Statistical Areas in Connecticut ("SMSA's"); the State of Connecticut as a whole; and in the "four-town area" of Milford-Orange-Derby-Ansonia. The intervenor and the defendants, on the other hand, argue that the State of Connecticut combined with New York City is the relevant geographic market to be considered by the Court.

### The SMSA's

The Standard Metropolitan Statistical Area or SMSA concept was devised by the Bureau of the Budget to facilitate compilation and reporting of statistics relating to the major metropolitan areas in the nation. (Finding 59). Under the criteria established by that agency, every SMSA is an integrated economic and social unit with a defined population nucleus; it is a geographical area carved out within the state which consists of contiguous cities and towns whose residents commute to work within the SMSA. Since the SMSA focuses on commuting patterns, argues the plaintiff, the SMSA represents a reasonable approximation of the area in which banking customers "can practicably turn" for convenient banking offices. Thus, it is claimed, the tests established

in *Philadelphia* and its progeny have been met.

The Court disagrees and is of the opinion that the plaintiff has failed to carry its burden of proof that the SMSA concept is a reliable vehicle to delineate the appropriate "section of the country" for the following reasons:

1. While it may be true that many people bank in the same community where they live and work, no evidence was presented as to the percentage of residents in any Connecticut SMSA who are customers within the same SMSA;

2. The banks physically located within each SMSA are not in competition only with themselves; meaningful banking alternatives are available to the individual and corporate consumer beyond the confines of each SMSA (Findings 63–66);

3. Both First New Haven and Connecticut National to a large degree have system-wide pricing practices which extend beyond any particular SMSA (Finding 70);

4. Influences exerted by banks outside the New Haven and Bridgeport SMSA's affect the prices of the banking services within those SMSA's (Findings 69, 71–2, 78);

5. The Bridgeport SMSA produces only 57% of Connecticut National's deposits (Finding 65);

6. None of the competitive reports filed, pursuant to 12 U.S.C. § 1828(c)(4), by the Federal Deposit Insurance Corporation, the Federal Reserve Board or the Department of Justice analyzed the proposed merger in terms of the SMSA concept (Findings 61–2);

7. All the bankers who testified were unanimous that the SMSA concept was not an accurate description of the banking markets in which they were engaged (Finding 60);

8. The SMSA concept has been rejected as an indicator of a marketing area by other district courts. See *Provident National,* supra, 280 F.Supp. at 6;

9. As noted hereinafter, the appropriate section of the country for the purposes of this case is the State of Connecticut as a whole.

### The "Four-Town" Area

The short answer to plaintiff's contention that the four towns of Ansonia, Derby, Milford and Orange constitute a relevant market is that plaintiff's own expert, Dr. Neal B. Murphy, testified unequivocally to the contrary. (Findings 208–9). In addition, there is no question that the competitive influences exerted upon the banks in the four-town area emanate from and operate in a much broader area than that encompassed by the four towns. There was no evidence that the banks in these towns change their prices in response to each other's competitive moves. As previously stated, most Connecticut banks, including both defendants, operate on a system-wide pricing basis, under which all branches throughout the bank's service area charge the same prices and no one branch moves independently in response to a nearby competitor in the same town.

Yet, despite these observations, it is a fact that there is direct and existing competition between defendants in the four-town area. FNH operates three offices in Milford, one in Orange and one in Derby; CNB has a branch in Milford and Orange, and two in Ansonia. Since the four-town area is the only overlap between the defendants' primary service areas, it is of concern to the Court, particularly if it is assumed, *arguendo,* that these towns are a relevant section of the country in this action.

However, the concern is academic because defendants have signed binding contracts to divest three of their branches in this area (Findings 10, 12), and are presently seeking buyers for three more branches. The Court has been assured that, if the merger is approved, the sale of these branches would be accomplished within a one-year period (Finding 11). The divestiture of all six branches (which as hereinafter noted is

a condition upon which this Court approves the merger) would leave FNH and CNB with only 1.26% and 1.50%, respectively, of each bank's total IPC demand deposits in the other's office towns. The resulting overlap, as plaintiff's expert admits, is "negligible." (Findings 215–6, 218).

■ The plaintiff's argument that the defendants' evidence with respect to divestiture should not be considered by the Court because it is an attempt "to negotiate a settlement in public" is rejected. It seems clear that the evidence, which is part and parcel of the merger agreement between the defendants, is an inseparable and relevant element of the entire proof on likely competitive effects. The Court must view the proposed consolidation as a complete picture; the divestiture is an intrinsic aspect of the merger. Therefore, the Court deems it appropriate and proper to weigh the effect of the divestiture plan as a matter of plain common sense. Cf. *Continental Can*, supra, 378 U.S. at 458, 84 S.Ct. 1738; FTC v. Consolidated Foods Corp., 380 U.S. 592, 598, 85 S.Ct. 1220, 14 L.Ed.2d 95 (1965).

Support for the Court's position is found in Procter & Gamble Co. v. FTC, 358 F.2d 74, 83 (6 Cir. 1966), rev'd on other grounds, 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967), wherein the court stated that: "The extent to which inquiry may be made into post-merger conditions may well depend upon the facts of the case, and where the evidence is obtained it should not be ignored." See also United States v. Atlantic Richfield Company, 297 F.Supp. 1061 (S.D.N.Y.1969), in which the court took into account the divestiture proposal submitted by the defendant.

### The State As A Whole

The plaintiff urges that the State of Connecticut as a whole be deemed the appropriate geographic area. It further argues that a corollary of such a finding is that the Court exclude from consideration the competitive influences of the New York banks. The intervenor and the defendants agree that the state is a relevant market but contend that the City of New York should also be included.

After a careful review of all the evidence and the leading authorities on the subject, the Court is convinced that neither extreme position should be adopted. The plaintiff certainly carried its burden of proof that the state as a whole is a "section of the country," (Findings 69–80) but its additional contention that the Court should ignore the impact of the New York banks on Connecticut's banking structure is utterly unrealistic. On the other hand, the intervenor and defendants failed to produce the quantum of proof necessary for the Court to include New York City as part of the relevant market. Yet, they introduced sufficient evidence to satisfy the Court that the influences of the New York banks require serious consideration and analysis when the Court considers the remaining crucial issues in this case, i. e., the impact of the merger upon competition and its effect in serving the convenience and needs of the community.

### D. EFFECT OF THE MERGER ON COMPETITION

Connecticut, the third smallest state in land area in the United States but the fifth most densely populated state in the country, is divided into 169 towns having almost autonomous political structures. A diffused growth of population has resulted in the largest city in the state (Hartford) having substantially less than 200,000 residents, and the four largest cities (Hartford, Bridgeport, New Haven and Stamford) containing in the aggregate only 19% of the state's population. During the last two decades there have been dramatic increases in the state's industrial growth and population (Findings 114–131).

However, the history of banking in Connecticut and its present banking structure are unique, and in many respects it is evident that Connecticut commercial banks have been "lagging"

in growth. In the Court's view, FNH and CNB as commercial banks are barely afloat in the rapidly developing business currents swirling around them; they just do not possess the finances, size, personnel or power to compete in a viable and healthy way in the prevailing world of commerce.

In the Court's opinion, the Findings amply support the following salient reasons for this lack of "banking muscle":

1) Connecticut's "Home Office Protection" laws which prohibit the establishment of a *de novo* branch office in any city or town in which the main office of another bank is located;

2) the lack of a sizeable financial center containing banks with sufficient resources to meet the needs of the large and growing resident industries, businesses, and public undertakings;

3) the active and aggressive canvassing of Connecticut's lush banking market by out-of-state banks, particularly those in New York City; and

4) the significant competition presented by the products and services offered by savings banks in Connecticut.

Despite elaborate statistical presentation and fervent argument, the plaintiff has not convinced the Court by a preponderance of the evidence that the merger in question will substantially lessen competition. While it is true that there has been a decrease in the number of commercial banks from 1955 to 1971, bare "numbers" in this case do not reflect the competitive realities.

The Court finds persuasive the defendants' evidence that the decrease in the number of commercial banks since 1955 has not actually increased concentration in the state's banking market. It appears clear that the larger or "wholesale" customers, who look to out-of-state banks in many instances, as well as the retail customers, whose banking options are most localized, enjoy substantially greater competitive alternatives than in 1955. Indeed, plaintiff's own expert agreed as illustrated in the following significant testimony:

Q. Is it possible to have in the State of Connecticut a more pro-competitive banking structure with sixty banks than with a hundred banks?

A. Yes.

Q. And how might that come about?

A. That would come about by local markets being deconcentrated by outside entrants.

THE COURT:

You were asked is it possible, and you said "yes".

THE WITNESS:

Yes.

THE COURT:

Now let me ask: based on your studies, do you have an opinion as to whether or not it is reasonably probable that that's what happened in the State of Connecticut?

THE WITNESS:

Yes, I think it has.

Q. Do you think between 1955 and 1971, despite the decrease in the number of banks, . . . Connecticut as a whole has become more competitive in banking?

A. Yes.

(Dr. Murphy, Tr. 406).

The Court has no disagreement with the plaintiff's approach that concentration ratios must be scrutinized, and that if the structure of the market examined is highly concentrated by the merger, competitive behavior is reduced. Under principles enunciated by the Supreme Court, there is no question that if certain market shares are proved and are realistic, anticompetitive effects may be deduced. In *Philadelphia,* it was held:

Specifically, we think that a merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market, is so inherently likely to lessen competition substan-

tially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects . . . .

The merger of appellees will result in a single bank's controlling at least 30% of the commercial banking business in the four-county Philadelphia metropolitan area. Without attempting to specify the smallest market share which would still be considered to threaten undue concentration, we are clear that 30% presents that threat. 374 U.S. at 363–364, 83 S.Ct. at 1741–1742.

See also United States v. Continental Can Co., supra; United States v. Von's Grocery Co., 384 U.S. 270, 86 S.Ct. 1478, 16 L.Ed.2d 555; United States v. Pabst Brewing Co., 384 U.S. 546, 86 S.Ct. 1665, 16 L.Ed.2d 765 (1966).

However, conclusions with respect to concentration ratios can only be reached after an examination of the facts in individual cases. There is no accurate degree of market control or increase in concentration which can be used as a guide. The decision in each case must turn upon its particular facts. To have functional meaning, concentration ratios must relate to the geographic market and line of commerce of the case in question.

In the instant case, the Court finds the plaintiff's concentration figures unreliable indicators of the probable competitive effects of the merger between the defendant banks. Plaintiff's allegation that the proposed consolidation will result in the defendants controlling over 11% of the market must be considerably "shaded", *Philadelphia, supra*, 374 U.S. at 364 n. 40, 83 S.Ct. 1715, in order to approximate the actual state of affairs. Adjustments must be made to reflect the business done by savings banks and out-of-state banks, particularly those in New York City. Reasonable allowances reduce the concentration ratios to less than a 1.8% increase in the combined shares of the ten largest commercial banks in the state and an increase of less than 0.9% in the combined shares

of the five largest banks, including savings banks.

As stated previously, Connecticut savings banks are formidable competitors which must be taken into account. See "Line of Commerce", Section B, supra. In addition, New York City banks exert forceful competitive influences on the quality and rates of banking services in Connecticut. (See generally Findings 246–269). Analysis of Connecticut's banking structure cannot be undertaken in a disembodied vacuum as if it were an island off the coast of Rhode Island. Connecticut provides a corridor-like business connection between two states which contain massive metropolitan financial centers. There is little question New York City banks compete actively, aggressively and effectively for Connecticut's banking market.

Among other competitive influences emanating from New York City banks, as amply set forth in the Findings, it is uncontroverted that approximately $484 million in deposits are held in 24,000 accounts of Connecticut customers in only six of the over 70 New York banks, that over $381 million in commercial, industrial and mortgage loans are from Connecticut clients, that at least 22,000 residents of Norwalk and Stamford work in New York, that banking representatives from New York regularly solicit business in Connecticut, and that New York banks advertise heavily in Connecticut.

This evidence led Dr. Stokes, an eminently qualified expert, to conclude that the impact of the New York banks is to be viewed "as if we were to introduce into [Connecticut's banking] structure a bank larger than all but the top three." (Tr. 997). In Buckley v. New York Post Corporation, 373 F.2d 175, 184 (2 Cir. 1967), the Second Circuit recognized that "Connecticut and New York City, although divided by a state boundary, are economically and intellectually one." Thus, it will be in the light of these considerations and reduced concentration ratios that the Court must determine the vital issues in this case.

### (1) *Actual Competition*

The Findings reveal that FNH and CNB serve essentially different areas, with the only exception being in the overlapping service area referred to as the "Four-Town Area," discussed supra. Even if the Court were to regard the four towns as a "section of the country," contrary to the opinion of plaintiff's expert, there would be no substantial lessening of competition after divestiture. In fact, the consolidation combined with the divestiture agreement will have a decidedly procompetitive effect in this area. Before the merger, 74.0% of the deposits in the four towns were held by three banks; after divestiture, only 55.2% of the deposits will be controlled by these banks. In addition, on a town-by-town basis there will be a net increase of four new banking alternatives. Therefore, it is patent that the effect of the consolidation and accompanying divestiture in the four towns will be an increase in competition which is not obtainable in any other foreseeable set of circumstances.

### (2) *Potential Competition*

Plaintiff's principal argument is that the merger will eliminate the potential for future competition between the two defendants.

The concept of potential competition is, of course, a valid one. See, e. g., United States v. Falstaff Brewing Corporation, 410 U.S. 526, 93 S.Ct. 1096, 35 L.Ed.2d 475 (1973); *Procter & Gamble,* supra. As the Supreme Court stated in United States v. Penn-Olin Chemical Co., 378 U.S. 158, 174, 84 S.Ct. 1710, 1719, 12 L.Ed.2d 775 (1964): "The existence of an aggressive, well equipped and well financed corporation engaged in the same or related lines of commerce waiting anxiously to enter an oligopolistic market would be a substantial incentive to competition which cannot be underestimated." And in *Falstaff,* supra, the Supreme Court emphasized that a district court in a Section 7 case must determine whether a defendant "was a potential competitor in the sense that it was so positioned on the edge of the market that it exerted beneficial influence on competitive conditions in that market."

Plaintiff argues the evidence shows that, absent approval of this merger, both defendants can and will expand by *de novo* branching into the other's service area and subsequently state-wide. It contends that the presence of the defendants "standing in the wings" as potential entrants exerts a healthy procompetitive effect from the fringe of the market. The substantial facts it relies on are: 1) CNB has been particularly aggressive in expanding by *de novo* branching, having opened 33 offices during the last 17 years; 2) FNH, although it has confined its *de novo* branching to New Haven County, has the capital and incentive to support significant *de novo* branching into Fairfield County and state-wide; 3) despite Connecticut's Home Office Protection laws, many towns in Connecticut still remain open to new entrants. On paper the plaintiff makes out a strong case, but the Court finds compelling counterpropositions more persuasive when the realities of the situation are analyzed.

A review of the defendants' *de novo* branching histories indicates that in most respects the banks acted prudently under the circumstances. For the most part, *de novo* branches were opened within each of the defendant's own service areas, contiguous to their administrative hubs. Cf. Crocker-Anglo, supra, 277 F.Supp. at 186. However, in order to keep up with the economic times and to become effective competitors either in the local markets or state-wide, the *de novo* route is just not financially or practically feasible, at least for the two defendant banks. The Findings provide elaborate supportive evidence for the following summary of pertinent reasons for the Court's conclusion on this issue:

1) Efficient entry by either bank into the other's service area is not possible because Bridgeport and New Haven are

closed towns. *De novo* branching into suburban communities will not produce actual competition; the factor of convenience and distance makes meaningful competition highly unlikely. No significant "wings" effect on price or quality would occur even if entry is established in nearby towns; true competitors must be on or close to center stage and not in the balcony because of the nature of the local markets in New Haven and Bridgeport. In this respect, the Court agrees with Professor Peck. (Findings 119–126).

2) The defendants' officers testified categorically to their lack of intention to expand into the other's service area by *de novo* branching. Although certainly not the last word on the subject, *Falstaff,* supra, no reason has been advanced for doubting their credibility. In all respects, their testimony was forthright, honest and based on sound business judgment. (Findings 182, 190, 206–7).

3) A representative of the Comptroller's Office testified that the Comptroller's present policy will not permit any significant *de novo* branch penetration by CNB into the service market of FNH, or vice versa. (Finding 34).

4) With respect to state-wide expansion, it is clear that neither defendant possesses the finances, personnel, or motivation to accomplish any meaningful growth on this level. In fact, CNB must now obtain special permission from the Comptroller to invest any more of its capital in fixed assets. (Findings 172–8).

5) Most of the open towns in Connecticut are remote from the financial action and have very few attractions to induce *de novo* branching.

6) The most likely entrants into the Connecticut banking structure are new competitors. (Finding 199).

The plaintiff further contends that each of the defendants could expand through *de novo* branching by opening new banks which are controlled by a holding company. See Conn.Gen.Stats. §

36–418. This is an entirely new concept not explored by any bank in Connecticut to date. Obviously and understandably, Connecticut bankers question the utility and legality of employing this avenue to avoid the state's Home Office Protection laws.

The Court gives full credence to the testimony that the defendants have neither the finances nor inclination to pursue the holding company route. Moreover, since 1965, the Comptroller has, with one exception, strictly adhered to its moratorium on new national bank charters in local banking markets in Connecticut. In addition, there was evidence produced which indicated that the policy of Connecticut's Banking Commissioner precludes chartering of a new state bank which is to be sold to a holding company. (Findings 203–4). The Court is satisfied that regulatory, legal, and economic barriers are sufficient to discount the holding company apparatus as a viable method of expansion by the defendants.

The plaintiff's additional assertion that the defendants could expand by "toehold acquisitions" was not proven at trial. No small banks were identified that were available for sale. CNB was unable to negotiate the purchase of smaller banks in the past (Finding 191), and, in any event, there exist no toehold acquisitions which would provide effective and economical entry into New Haven.

Finally, the plaintiff contends that a consummation of this proposed merger will result in a "triggering" of other mergers which will have anticompetitive effects on Connecticut's banking structure. The Court fails to follow the plaintiff's logic. No bank merger can foster another bank merger because each future situation must be dealt with under established antitrust principles on a case by case basis. (Findings 225–30). Bank consolidations must have appropriate regulatory approval and *de novo* judicial review if challenged by the Department of Justice. Surely the instant case cannot proscribe or permit a future

proposed merger; the conclusions reached in another case must have a rational basis to be sustained in fact and in law.

## E. CONVENIENCE AND NEEDS OF THE COMMUNITY

Pursuant to the provisions of 12 U.S.C. § 1828(c)(5)(B), the defendants at trial introduced evidence that any hypothesized anticompetitive effects of the merger were clearly outweighed by the resultant bank's increased ability to meet the convenience and needs of the community. In defining the guidelines to be applied in order to determine whether the defendants have sustained their burden of proof, controlling authorities have stressed, first, that the merger must result in benefits to the community to be served which clearly outweigh the anticompetitive effects of the merger, and, second, that such benefits could not be achieved by a less anticompetitive means than the merger. *Phillipsburg*, supra; *Nashville*, supra; *Houston*, supra.

With these general standards in mind, each case must turn on its own facts. In the instant case, it is the Court's considered opinion that the Findings fully support the conclusion that the merger will satisfy the convenience and needs of the community in that:

1) The combined bank will be able to compete on a state-wide level in the foreseeable future with CBT and Hartford National, the only two banks heretofore capable of performing state-wide banking services. Alone neither of the defendants could develop the capacity to move into other parts of the state; together the resultant bank will provide significant competition for the two Hartford banks throughout the state, and more particularly in Hartford and in New London. (Findings 233–38).

2) The creation of another state-wide competitor will slow the accelerating dominance of the state by the two large Hartford banks and will significantly deconcentrate their power in important counties of the state. (Findings 235–6, 240).

3) The mobilized financial resources and increased lending limits will enable the consolidated bank to give banking consumers, both wholesale and retail, truly meaningful choices. (Findings 241–258).

4) The resultant bank would attract business now going out-of-state by offering a full range of international, trust and municipal financing services. (Findings 269–292).

5) The merger would benefit many small businessmen as well as the large corporations. (Findings 259–60).

6) The consolidation will result in new entries into several local markets which will make available a broader range of banking services to the entire banking public. (Finding 232).

7) Neither bank, for reasons stated heretofore, can provide these benefits to the public in the absence of an approval of this merger. (Findings 237–8).

## III. SUMMARY AND ORDERS

Accordingly, the Court finds: 1) that the plaintiff has failed to sustain its burden of proof that the instant merger may tend substantially to lessen competition, actual or potential, in any section of the country; and 2) that, assuming *arguendo* there were any such anticompetitive effects as a result of this consolidation, such effects are clearly outweighed by the convenience and needs of the community to be served.

Therefore, judgment will be entered against the plaintiff and in favor of the defendants and the intervenor. Defendants shall, prior to July 6, 1973, prepare and submit to the Court, with due notice to the plaintiff, an appropriate form of judgment (including an order with respect to the divestiture of the six branch offices in the four-town area). A hearing on the proposed order will be held on July 16, 1973, at 11:00 A.M. in New Haven.